796 P.2d 109

**STATE of Idaho, Plaintiff–Respondent,**

v.

**John Raoul SOURA, Defendant–Appellant.**

**No. 17412/17948.**

Supreme Court of Idaho.

July 30, 1990.

D. Ray Barker, Moscow, for defendant-appellant.

Jim Jones, Atty. Gen., Michael A. Henderson, Deputy Atty. Gen. (argued), Boise, for plaintiff-respondent.

BAKES, Chief Justice.

Defendant John Raoul Soura appeals from a conviction for rape and the infamous crime against nature. Soura's rape conviction was based upon his having sexual intercourse with a woman who was incapable of giving legal consent due to unsoundness of mind. Soura was sentenced to a term of ten to fifteen years for rape, and a concurrent five-year term for the infamous crime against nature.

Soura was charged with raping a young married woman sometime during the month of April, 1987. He was also charged with committing the infamous crime against nature against the woman. The information charged Soura with accomplishing the rape by having sexual intercourse with a female, not his wife, who through unsoundness of mind was incapable of giving legal consent to such act. The primary factual issue on this appeal is Soura's claim that, even in light of her mental disabilities, the woman was capable of giving legal consent to engage in sexual intercourse with Soura.

Soura and the woman became acquainted in December, 1986. Soura worked as a nurse's aide for a quadriplegic man who lived near the woman and her husband. The woman's husband, like his wife, was a person with mental disabilities. The woman's husband worked as a night janitor in a local motel. During the early part of 1987, Soura and the woman spent a great deal of time together socializing while her husband slept or worked. Soura and the woman soon began to have sexual intercourse together. In early April, Soura moved into the couple's trailer, where the acts of sexual intercourse continued, and where Soura allegedly committed an act of cunnilingus on the woman.

When this conduct came to light, Soura was charged and later convicted by a jury of rape, I.C. § 18–6101, and the infamous crime against nature, I.C. § 18–6605. On appeal, Soura alleges that the trial court

erred (1) by denying his motion to suppress statements made to a police officer after his arrest and allegedly after he had indicated a desire to consult with an attorney, (2) by misinstructing the jury, (3) by sustaining the jury's verdict on the element of the woman's inability to give legal consent to an act of sexual intercourse, and (4) by imposing a sentence which was unduly severe considering the nature of the offenses and the character of the defendant. We affirm the trial court's judgment and sentence.

I

On appeal Soura first asserts that the trial court erroneously admitted statements allegedly made by Soura to police investigator Ron Baune on June 11, 1987, after Soura claims to have indicated his desire to consult with an attorney. However, upon review of the record, we see no evidence that the defendant ever informed the police that he was invoking his right as set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), to consult with an attorney before undergoing questioning or to have an attorney present during questioning. On the contrary, the record indicates that Soura effectively waived his *Miranda* rights on two occasions. Furthermore, the defendant made similar statements to other officers prior to the contested discussion with Officer Baune. These other statements, which were not objected to, were made following Soura's first waiver of his *Miranda* rights. The content of these statements is substantially similar to the content of the subsequent statements to which Soura objected.

The record indicates that Soura was arrested on June 4, 1987, on a probation violation warrant on an unrelated sex offense out of Bonner County. The following day Detective Jake Kershisnik spoke with Soura about his involvement with the woman involved in this case. Kershisnik informed the defendant orally and in writing of his *Miranda* rights. Soura waived his *Miranda* rights at that time and gave a statement which he later testified was voluntary. In his conversation with Kershis-

nik, Soura admitted that he had been sexually involved with the woman since January, 1987. Soura acknowledged that the woman was "very slow," and "not very competent." He said that "she can't tell when a guy's coming on to her." Soura told Kershisnik:

> If you were to look at [her] and tell her to get undressed, get into bed, she would do it if you told her to do it, if you asked her to do it, she'd tell you no or she'd say do I have to, but if you looked at her and gave her an order do it, she would do it.

At that time, Soura told the detective Kershisnik that he wanted to take a polygraph examination, and an exam was set for June 11, 1990.

After making these statements to Kershisnik, but before the polygraph examination, Soura alleges that on two occasions, on June 8 or 9, 1987, he attempted to make long distance telephone contact with an attorney who had been appointed to represent him on an earlier probation violation charge. This call was not placed because it was against Latah County jail policy to allow long distance calls. There is no indication in the record that Soura informed the jailers to whom he made the request to use the telephone that he was invoking his right to consult with an attorney before undergoing further questioning.

Soura alleges that at another time between June 5 and 12, 1990, he called the office of the Latah County public defender. Soura testified that the public defender's secretary told Soura that because the public defender had not been appointed on the case, he could not speak with him. Soura does not allege that the officers were aware of this telephone call, the nature of the call, nor whether he informed the officers that he was invoking his right to consult with an attorney before further questioning.

On June 11, 1987, Officer Ron Baune conducted the polygraph examination which Soura had requested. Before doing so, Soura was again informed of his *Miranda* rights by Officer Baune and signed a written waiver. The two conversed until Soura indicated that he did not want to speak further. At trial, Baune testified that during that conversation Soura admitted to having sexual intercourse with the woman about twelve times from January to April 1, 1987, and that "she was extremely passive and it was his responsibility to suggest the sexual activity each time." The rape and infamous crime charges were filed after this polygraph examination took place.

Soura contends on appeal that the trial court erred in admitting these statements which were made after he claims that he had invoked his *Miranda* right to consult with an attorney before further questioning. Soura contends that the questioning which produced the objectionable statements violated the rule in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), which held that a defendant, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484–85, 101 S.Ct. at 1887. However, Soura never "expressed his desire to deal with the police only through counsel...." *Id.* On the contrary, Soura never informed the police that he was invoking his right to consult with an attorney before further questioning, and it cannot be fairly said that he invoked this right. The simple mention of the word "lawyer" or "attorney" by the defendant will not necessarily invoke this right or warrant an exclusion of the evidence at trial. *Connecticut v. Barrett*, 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987). In *Barrett*, the defendant stated that he was willing to talk but would not put anything in writing unless his attorney was present. The United States Supreme Court held that the officers' continued oral questioning of Barrett was consistent with his desires and that there was no violation of his *Miranda* rights. In *United States v. Fouche*, 833 F.2d 1284 (9th Cir.1987), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988), the Ninth Circuit Court of Appeals held that defendant's statements to police

were not made in violation of his *Miranda* rights. In *Fouche,* the defendant interrupted custodial questioning and stated that he "might want to talk to a lawyer." The police then left the room during the phone conversation. After returning into the room, the officers again informed the defendant of his rights and obtained an explicit waiver. The defendant then told the officers that he had not called a lawyer, but his wife. After further discussion, Fouche agreed to make a statement. The court approved the admission of the statements into evidence and held that *Edwards* did not apply because the officers had properly clarified the defendant's ambiguous remarks.

█ After reviewing the record and the arguments presented by the parties on appeal, it is evident that Soura was properly informed of his *Miranda* rights on June 5, 1987, and again on June 11, 1987, and that he waived them on both occasions. At no time did Soura inform the police that he was invoking his right to have counsel present during questioning or any desire to deal with the police only through his counsel. We have been cited to no case, nor are we aware of any case, which holds that the *Miranda* right is invoked when a defendant unsuccessfully tries to make contact with an attorney while no questioning is taking place. We therefore conclude that there was no violation of Soura's *Miranda* rights and that Officer Baune's testimony was properly admitted. *Connecticut v.* *Barrett, supra.* Even if there had been error in the admission of Officer Baune's testimony, it was harmless because the content of Soura's statements to Detective Kershisnik on June 5 was substantially similar to the June 11 statement to Officer Baune, and there is no claim made that these earlier statements were in violation of Soura's *Miranda* rights.

## II

█ Next we consider Soura's second assertion of error. Soura was convicted of violating I.C. § 18–6101 which provides as one definition of rape: "an act of sexual intercourse with a female ... where she is incapable, through lunacy [or] any other unsoundness of mind, whether temporary or permanent, of giving legal consent." Soura argues that the jury was misinstructed on this definition because Instruction No. 10 contained the following sentence: "Inability to understand and appreciate such results [*e.g.,* social ostracism stemming from unlawful sexual intercourse] and their effect and the inability to make a knowing choice renders one incapable of giving *an intelligent or* legal consent to the act." (Emphasis added.)[1] Soura contends that the reference to "intelligent consent," taken from *State v. Cosler,* 39 Idaho 519, 525, 228 P. 277, 279 (1924), is wrong because it instructs the jury to determine whether the woman was incapable of making an intelligent choice, *i.e.,* whether she could exercise good judg-

---

1. Instruction No. 10 stated in full:

All persons are not mentally equal. Unsoundness of mind is a relative term. For a person to be legally capable of giving consent to an act of sexual intercourse, such person must of necessity have some knowledge of the consequences of the results that naturally flow from such act, that an unlawful act offends against the moral law, results more or less in social ostracism, and be able to make a knowing choice as to whether or not to engage in such act of sexual intercourse. Inability to understand and appreciate such results and their effect and the inability to make a knowing choice renders one incapable of giving an intelligent or legal consent to the act.

Thus, in this case, you cannot find the defendant guilty of the crime of rape unless the State proves beyond a reasonable doubt, in addition to proving beyond a reasonable doubt all other material elements of the crime of rape, that at the time the act of sexual intercourse occurred between the defendant and [the woman]:

(1) [The woman] was of unsound mind; and

(2) Because of such unsoundness of mind [she] was incapable of giving legal consent to such act of sexual intercourse.

In addition, Instruction No. 9 stated:

A woman is of unsound mind if she is incapable of normally managing herself or her affairs in a reasonable manner. Unsoundness of mind exists when the woman's intellectual powers are fundamentally lacking, or where she is incapable of understanding and acting with discretion in the ordinary affairs of life. The term, "unsoundness of mind," thus includes a range of mental impairment.

ment. Soura argues that a better standard for defining legal consent is to determine whether she has "an intelligence capable of understanding" the nature and consequences of sexual intercourse.

We are not persuaded by Soura's argument that *State v. Cosler, supra,* sets forth an erroneous and confusing standard or that his suggested alternative is necessarily better. Instruction No. 10, particularly when read together with Instruction No. 9,[2] properly defines the ability to give legal consent in terms of (1) the ability to understand and appreciate the possible consequences of sexual intercourse, and (2) the ability to make a knowing choice. This definition is consistent with *State v. Cosler, supra,* in which we wrote:

In order that one be incapable of giving legal consent, she must, through lunacy or other unsoundness of mind, be incapable of understanding the nature of the act and of giving intelligent consent thereto.

39 Idaho at 525, 228 P. at 279. We therefore find no error in the giving of Instruction No. 10.

### III

■ We now consider Soura's argument that there was insufficient evidence presented at trial to support the jury's finding of guilty, particularly on the element of the woman's inability to give legal consent to an act of sexual intercourse. Soura argues that factually the alleged victim was able to consent because (1) she had sufficient intelligence to live on her own and take care of herself, (2) she had been through a pregnancy and had demonstrated knowledge of sexual intercourse and birth control methods, (3) she had an understanding that it was inappropriate to go to bed with a man not her husband and that this could lead to divorce, and (4) she was able to withhold consent, as demonstrated by evidence that she had resisted at least one of Soura's sexual advances. Soura further argues that logically the alleged victim was able to consent because (1) she is deemed to have the ability to give legal

consent to marry and engage in sexual relations with her husband, and thus she could legally give consent to engage in sexual relations with Soura, and (2) had the capacity to legally consent to terminate her parental relationship with her infant daughter and therefore had the capacity to engage in sexual intercourse with Soura.

We are not persuaded by Soura's arguments which are grounded on his view of the factual circumstances and logical inferences. "[A]n appellate court must review the evidence most favorable to the prevailing party below and draw all reasonable inferences in its favor." *Lopez v. Langer,* 114 Idaho 873, 878, 761 P.2d 1225, 1230 (1988); *McBride v. Ford Motor Company,* 105 Idaho 753, 673 P.2d 55 (1983). "On appellate review, a verdict supported by substantial, though conflicting, evidence will not be set aside." *Harmston v. Agro-West, Inc.,* 111 Idaho 814, 821, 727 P.2d 1242, 1249 (1986); *Big Butte Ranch, Inc., v. Grasmick,* 91 Idaho 6, 415 P.2d 48 (1966).

Upon review of the record we concur with the trial court's finding that there was substantial competent evidence to support the jury's verdict which held that the woman was unable to legally consent to sexual intercourse with the defendant. The evidence in support of the jury's verdict can be briefly summarized as follows. She had a passive personality with an I.Q. of 71, which places her in the lower two and one half percent of the population. Testimony was presented that (1) the woman has never held a job and would probably be capable of performing only menial tasks and then only under close supervision, (2) she is unable to perform domestic work, (3) she is unable to take long trips without close supervision, and (4) she had not completed special education courses in high school. Additionally, the woman was incapable of providing adequate care for her baby girl when the infant lived with her. The child was placed into protective custody after it was discovered that her arm was broken and her mother was unable to explain how

2. See footnote 1.

the injury occurred. Subsequently the parental relationship was terminated. Although she had previously delivered a child, testimony was presented that the woman did not understand the potential physical consequences of sexual intercourse, *e.g.*, pregnancy, syphilis, gonorrhea and herpes. While, as a result of these proceedings, she now understands that divorce is a possible consequence of extramarital sexual relations, the record does not demonstrate that she knew this at the time that Soura was having sexual relations with her.

In support of his argument, Soura claimed that she sometimes resisted his sexual advances. However, the fact that she resisted an invasion of her body could have been understood by the jury to demonstrate that the woman, like all humans, has volitional abilities. Her resistance and non-resistance does not conclusively establish that she understood and appreciated the physical, emotional and moral consequences of sexual intercourse with the defendant.

We also reject Soura's argument that the victim was capable of legally consenting to sexual intercourse with him by inference because she had been deemed capable of legally consenting to marriage, sexual relations within marriage, and termination of parental rights to her infant daughter. This argument is based on the assumed logical conclusion that when one is determined to be capable of legally consenting to one activity, they are conclusively presumed to be capable of legally consenting to all other activities. A determination of capability for legal consent depends in large part on the activity involved and the purposes of the laws governing that activity. Some laws fix a bright line of age qualification. While adolescents are deemed capable and responsible at age 16 to drive, females are not deemed capable of consenting to sexual intercourse until they are 18. I.C. § 18–6101.

Concerning the woman's capability to consent to marriage and sexual relations with her spouse, understandably the law has granted leeway so that even persons of limited intelligence, such as this woman and her husband, may exercise their constitutionally recognized right to marry and procreate. Marriage has long been favorably recognized in our society as one of the fundamental institutions upon which our society is founded. Accordingly, the laws reflect a certain favorability toward creating and maintaining stable and harmonious marriages. The same cannot be said about non-marital sexual relations which are not considered by society in a favorable light, in part because of the difficult consequences that may follow, *e.g.*, unplanned pregnancy, single parent families, divorce, venereal disease and AIDS. The laws reflect this societal attitude against non-marital sexual intercourse and aim to protect those most vulnerable, due to unsoundness of mind or immaturity, from incurring some of the resulting difficult consequences. Thus, while it is legal for a man to engage in sexual relations with his 15–year–old wife, the law protects a 15–year–old female from sexual relations with a man who is not her husband. The same logic applies to the woman involved in this case. The purpose of I.C. § 18–6101 is to protect women with mental disabilities, such as the woman involved in this case, from the many potential difficulties resulting from non-marital sexual relations.

Concerning the woman's capability to terminate parental rights to her child, one must again focus on the purpose of the law. While I.C. § 18–6101 is designed to protect women, particularly those of unsound mind or immaturity, the law of parental termination strives to protect not only the parent's interests but also, and perhaps more so, the child's. Here, it is apparent that it was precisely the woman's lack of mental capabilities and her inability to responsibly provide adequate care for her daughter that had a great deal to do with the decision of the court to terminate her parental rights. Thus, it is of little import that the she was apparently deemed capable of legally consenting in a different proceeding to the termination of her parental rights to her child, and yet be found by the jury in this case not to be capable of

legally consenting to non-marital sexual intercourse with the defendant.

The most striking evidence in support of the trial court's determination that there was substantial evidence to support the jury's finding that the woman could not legally consent to sexual intercourse with Soura was the appearance of the victim herself. While this Court is unable to view the demeanor and appearance of the victim as a witness at the trial, we do have as a reference the trial court's comments. The trial court found her answers to be slow and short; her facial expressions consisted of a "sagging jaw, mouth open ... she appeared to stare off into space at times." We find no error in the trial court's finding that there was substantial competent evidence to support the jury's verdict of guilty.

## IV

■ Finally we consider whether the sentence imposed was unduly severe, considering the nature of the offense and the character of the defendant. Soura was sentenced to ten to fifteen years for rape and five years, to be served concurrently, for the infamous crime against nature, each well within the maximum sentences for each crime of life imprisonment. For the reasons set forth below, we find that the district court did not err in exercising its discretion in sentencing.

While this sentence may seem fairly severe for a seemingly non-violent crime of this nature, we are not convinced that the district court abused its discretion. Soura has a lengthy criminal background which includes convictions for disturbing the peace, driving while under the influence, and two convictions for inattentive driving. He has also been charged with burglary, attempted burglary, conspiracy to escape, obstructing an officer, statutory rape, and two charges of lewd conduct. More disturbing is the fact that the crimes of which he was convicted in this case occurred while he was on probation for a conviction involving oral sex with an 11 year old girl. Soura's probation officer testified that the defendant would be an "extreme probation risk" if placed on probation again. Soura has an unfortunate history of seeking out those who are most vulnerable, including young girls and women with intelligence disabilities.

Soura maintains that he should be given probation and corrective treatment for his personality disorder. Dr. Michael P. Emery, in a character report, advised the district court that Soura is a person with limited social skills who does not know when he is being accepted or when he is being rejected. Dr. Emery opined that Soura's disorder was treatable and that "[s]uch treatment could be entered with cautious optimism. Incarceration without treatment would probably exacerbate the personality disorder." However, the program in which Soura proposed to be placed had no openings at the time of sentencing and even the trial court's recommendation would not insure that Soura would be placed in such a program. As the district court summed it up:

> Mr. Soura's proposed probation program is at this point pie in the sky. The program which Dr. Emery hopes to put into operation ... is not as yet in operation. There's no assertion that it will be in operation. There's no assurance whatsoever that Mr. Soura would be accepted into the Intensive Supervision Probation by the Department of Correction. On the contrary, it's likely ... that he wouldn't be accepted because it's necessary to be accepted in that program that a probationer recognize the problem that he has and the criminality of his acts which led to him being placed on probation.

The district court concluded:

> [I]n light of the defendant's prior criminal record of becoming sexually—unlawfully involved with vulnerable people— the primary and overriding consideration in the sentence I imposed ... still is the protection of the public and deterrent to the public and this particular defendant.

The district court did not err in its assessment of the situation, and we affirm the judgment of the district court.

Judgment of conviction and sentence affirmed.

BISTLINE JOHNSON, BOYLE and McDEVITT, JJ., concur.

BISTLINE, Justice, specially concurring.

While I concur in the result of the majority opinion, I do not feel comfortable joining fully in an opinion that skims quickly over a number of important points, enumerated below.

First, the majority opinion does not recognize that this is a criminal case, and that all criminal cases have a distinct and separate set of standards of review. For that simple reason, the citation to civil cases for the standard of review is wrong (*see* 118 Idaho at 236, 796 P.2d at 113), and must be corrected before I consider throwing in my vote for the majority opinion's rationale.

Second, the majority characterizes the sentence received by the defendant as "fairly severe." At 238, 796 P.2d at 115. This characterization is not accurate; the sentence is quite severe, and deserves at least the attention the Court of Appeals gives to each and every case of sentence review. Instead, this Court, in a somewhat rambling and informal manner, affirms the judgement of the district court. I would not be so quick to dispense with this sentence review.

Third, I do not understand why the majority takes the time to relate anecdotal evidence of the victim's appearance in court in order to support the district court's determination that the victim could not legally consent. *See* 118 Idaho at 238, 796 P.2d at 115. If I did not know better, I would have thought that the day was long gone when a person's intelligence was judged by a person's appearance.

Fourth, the analysis of the victim's consent to both the termination of parental rights, and her consent to be married is central to this appeal, yet it is not given the attention which it deserves. The opinion points out that a court terminated the victim's parental rights precisely because the victim was an incompetent mother. This evidence is highly pertinent to determining whether the victim was able to consent to the acts at issue. The fact that the victim consented to marriage means nothing, because there is no provision for the independent determination whether such consent exists, unless the bride-to-be is underage. *See* I.C. § 32–202.