**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Raymond RAMBOUSEK, Defendant and Appellant.**

**Cr. No. 910071.**

Supreme Court of North Dakota.

Jan. 9, 1992.

Dwight C.H. Kautzmann of Bair, Brown & Kautzmann, Mandan, for defendant and appellant.

Tom M. Henning, Asst. State's Atty., Dickinson, for plaintiff and appellee.

LEVINE, Justice.

Raymond Rambousek appeals from a judgment of conviction entered upon a jury verdict finding him guilty of conspiracy to commit murder. We affirm.

Rambousek met with three individuals in a Dickinson motel room. Two of the three were undercover State Crime Bureau agents posing as "hit men"; the third was a Dickinson Police Department informant. No others were present. Rambousek and the three individuals discussed murdering a witness who apparently had damaging information about criminal charges pending against Rambousek. Rambousek gave a signed certificate of title to a 1977 Cadillac to one of the undercover agents as partial payment for the contemplated murder.

Rambousek was charged with criminal conspiracy to commit murder, a Class AA felony. *See* NDCC §§ 12.1–06–04(1) and 12.1–16–01(1)(a). During their depositions, the three individuals testified that they never intended to enter into an agreement with Rambousek to kill anyone and that they, in fact, were actually attempting to prevent the murder. Based upon that testimony, Rambousek unsuccessfully moved to dismiss the charge of conspiracy. He claimed that any agreement was unilateral, not bilateral, and thus it was a "legal impossibility" for him to commit the crime of conspiracy. Rambousek was tried and convicted of criminal conspiracy. This appeal followed.

Rambousek's basic proposition is that NDCC § 12.1–06–04(1) requires a bilateral agreement among conspirators. He argues that because the co-conspirators in this case had no intention of carrying out the murder, there was no bilateral agreement and therefore there was no conspiracy. We disagree.

NDCC § 12.1–06–04(1) says:

"A person commits conspiracy if he agrees with one or more persons to engage in or cause conduct which, in fact, constitutes an offense or offenses, and any one or more of such persons does an overt act to effect an objective of the conspiracy. The agreement need not be explicit, but may be implicit in the fact of collaboration or existence of other circumstances."

Rambousek contends the words "agrees" and "agreement" within NDCC § 12.1–06–04(1) denote mutual assent, a contract or a meeting of the minds of the conspirators. He urges that our statute requires a bilateral agreement. The State asserts that NDCC § 12.1–06–04(1) only requires a unilateral agreement, contending that the language "[a] person commits conspiracy if he agrees ..." refers only to the subjective behavior of one person and is not dependent upon the beliefs or intentions of co-conspirators. The statute does not define either "agrees" or "agreement."

In *State v. Kihnel*, 488 So.2d 1238, 1240 (La.App. 4 Cir.1986), the Louisiana appellate court, while interpreting a conspiracy statute admittedly different from our own, deftly explained the concepts of unilateral and bilateral conspiracy:

"Under a unilateral formulation, the crime of conspiracy is committed *when a person agrees* to proceed in a prohibited manner; under a bilateral formulation, the crime of conspiracy is committed *when two or more persons agree* to proceed in such manner. *See Note* [Conspiracy; Statutory Reform Since the Model Penal Code, 75 Colum.L.Rev. 1122, 1136 (1975)]. Under either approach, the agreement is all-important to conspiracy. Under the unilateral approach, as distin-

guished from the bilateral approach, the trier-of-fact assesses the subjective individual behavior of a defendant, rendering irrelevant in determining criminal liability the conviction, acquittal, irresponsibility, or immunity of other co-conspirators. See Burgman, [Unilateral Conspiracy: Three Critical Perspectives, 20 DePaul L.Rev. 75, 76–77 (1979)]. Under the traditional bilateral approach, there must be at least two 'guilty' persons, two persons who have agreed." (Emphasis in original.)

■■■ Construction of a statute is a question of law, fully reviewable by this court. *State v. Bower,* 442 N.W.2d 438 (N.D.1989). The primary objective of statutory construction is to ascertain the intent of the legislature. *Id.* at 440. A statute is ambiguous if it is susceptible to differing but rational meanings. *Souris River Tel. v. Workers Comp. Bureau,* 471 N.W.2d 465 (N.D.1991); *State v. Silkwood,* 317 N.W.2d 124 (N.D.1982). When a statute's language is ambiguous or of doubtful meaning, we may consider extrinsic aids, including legislative history, along with the language of the statute, to ascertain the legislature's intent. NDCC § 1–02–39(3); *Bower,* 442 N.W.2d at 440. Criminal statutes are strictly construed against the government and in favor of the accused. *E.g., State v. Hogie,* 424 N.W.2d 630 (N.D. 1988).

■■■ The first part of NDCC § 12.1–06–04(1) is written in the singular and emphasizes the subject. Thus, the subject, "[a] person", engages in conspiracy, if that person agrees "with others." It is this language that is the basis for the State's construction of the statute as unilateral. However, the statute also refers to "[t]he agreement". "Agreement" is commonly defined as mutual assent, a "meeting of the minds" of two or more people. And so Rambousek argues that there must be a bilateral agreement. We conclude that the statute is susceptible of either meaning and that either is rational and thus the statute is ambiguous. Consequently, we resort to extrinsic aids, in this case, the statute's legislative history, to resolve the ambiguity.

Title 12.1, NDCC, was the result of a 1971–73 interim study of the revision of criminal law by the Committee on Judiciary "B" of the North Dakota Legislative Council. *State v. Bourbeau,* 250 N.W.2d 259 (N.D.1977). The Judiciary "B" Committee members wanted to provide the legislative history underlying their revision of the North Dakota criminal law in order to facilitate future statutory interpretation. Minutes of the Committee on Judiciary "B", N.D. Legislative Council, Sept. 20–21, 1971 at 11. So, Committee members were provided copies of the proposed Federal Criminal Code, which was completed in 1971 by the National Commission on Reform of Federal Criminal Laws,[1] and the National Commission's "Working Papers." These materials provided the basis for the revision of the North Dakota Criminal Code by the Committee on Judiciary "B". *See Bourbeau,* 250 N.W.2d at 264.

■■■ NDCC § 12.1–06–04(1) is drawn from § 1004(1)[2] of the proposed Federal

---

**1.** The federal government did not adopt the proposed Federal Criminal Code. Various revisions of the proposed Federal Criminal Code were introduced in Congress from 1973 to 1975, but were not enacted. *See New Movement on Criminal Code Reform,* 38 Cong. Q. 1899 (1979). In 1977, the Federal Criminal Code Reform Act of 1977–78, which was a revised version of the proposed Federal Criminal Code, was passed by the Senate, S. 1437, 95th Cong. 1st Sess. (1978), but not by the House, H.R. 6869, 95th Cong., 1st Sess. (1978). *New Movement, supra* at 1899. The definition of conspiracy within S. 1437 all but mirrored the definition within the proposed Federal Criminal Code. S. 1437, ch. 10, said, "[a] person is guilty of an offense if he agrees with one or more persons to engage in conduct,

the performance of which would constitute a crime or crimes, and he, or one of such persons in fact, engages in any conduct with intent to effect any objective of the agreement." *Senate-Passed Criminal Code Dies in the House,* 34 Cong. Q. 165, 168 (1978).

**2.** Section 1004(1) of the proposed Federal Criminal Code says:

"Offense. A person is guilty of conspiracy if he agrees with one or more persons to engage in or cause the performance of conduct which, in fact, constitutes a crime or crimes, and any one or more of such persons does an act to effect an objective of the conspiracy. The agreement need not be explicit

Criminal Code and is all but identical with it. Accordingly, we may look to the drafters' official commentaries concerning § 1004(1) for insight into the meaning and application of our statute. *See, e.g., Bower,* 442 N.W.2d at 440; *State v. Leidholm,* 334 N.W.2d 811 (N.D.1983). The drafters' commentaries on the subject are instructive:

"Plainly the new Federal conspiracy law should reject holdings and dicta to the effect that where A and B plan to commit an offense, it is a defense to A that B was insane, or had no intention to carry out the plan (that is, did not subjectively 'agree'), or has been let off by the jury. It is sufficient that 'he [the accused] agrees.'" 1 Working Papers of the National Commission on Reform of Federal Criminal Laws, *Introductory Memorandum and Excerpts from Consultant's Report on Conspiracy and Organized Crime: Sections 1004 and 1005* (1970).

The commentators emphasize that the bilateral conspiracy theory should be abandoned. To accomplish this, the drafters of § 1004(1) of the proposed Federal Criminal Code used language that was distinguishable from the traditional bilateral language of the existing conspiracy statute. *See* 18 U.S.C. § 371 (1991).[3]

NDCC § 12–03–01,[4] the predecessor to NDCC 12.1–06–04(1), was also phrased in traditional bilateral language. Our legislature abandoned that bilateral language and adopted instead the language of § 1004(1).

Guided by the clear statement of the drafters of the proposed Federal Criminal Code and the use of the identical language in our statute, we believe the legislature intended a unilateral, not bilateral, approach to conspiracy. The unilateral approach requires only that Rambousek believe that he was participating in an agreement with another to engage in criminal conduct, manifested by some overt act, for Rambousek to be guilty of conspiracy.

■ Rambousek urges us to construe the ambiguity within this criminal statute strictly in his favor and against the government. We have frequently acceded to similar pleas. *E.g., State v. Plentychief,* 464 N.W.2d 373 (N.D.1991); *Hogie,* 424 N.W.2d at 635; *City of Bismarck v. Sholy,* 430 N.W.2d 337 (N.D.1988). However, when an ambiguity can be resolved by resort to explicit, unambiguous legislative history, we need not resort to a canon of construction that would contradict the legislative intent articulated by the drafters themselves. If the drafters' comments to the proposed Federal Criminal Code were less concise, Rambousek's argument would have more appeal. *Cf. Hogie,* 424 N.W.2d at 635.

Our conclusion that only a unilateral agreement is required is in accord with the majority of jurisdictions that has interpreted statutes similar to our own. *E.g., State v. St. Christopher,* 305 Minn. 2264, 232 N.W.2d 798, 803 (1975) [because of the

---

but may be implicit in the fact of collaboration or existence of other circumstances."

3. Chapter 18 U.S.C. § 371 says:
"If two or more persons conspire either to commit an offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.... "

4. "NDCC § 12–03–01. In the following cases, persons shall be guilty of a misdemeanor if two or more conspire:
1. To commit a crime;
2. Falsely and maliciously to indict another for a crime, or to procure another to be complained of or arrested for a crime;
3. Falsely to institute or maintain an action or special proceeding;
4. To cheat and defraud another out of property, by any means which in themselves are criminal or which, if executed, would amount to a cheat, or to obtain money or any other property by false pretenses;
5. To prevent another from exercising a lawful trade, or calling, or doing any other act, by force, threats, intimidation, or by interfering or threatening to interfere with tools, implements, or property belonging to or used by another, or with the use or employment thereof; or
6. To commit an act injurious to the public health, to public morals, or to trade or commerce, or for the perversion or obstruction of justice, or of the due administration of the laws."

wording, "[w]hoever conspires with another" a bilateral interpretation would be unsound]; *Garcia v. State*, 271 Ind. 510, 394 N.E.2d 106, 109 (1979) ["A person conspires ... when ... he agrees with another"]; *State v. Marian*, 62 Ohio St.2d 250, 405 N.E.2d 267, 269 (Ohio 1980) ["No person ... shall ... [w]ith another person or persons, plan or aid in the planning the commission of any ... offense"]; *State v. Welty*, 729 S.W.2d 594, 596 (Mo.App.1987) ["A person is guilty of conspiracy ... if ... he ... agrees]; *see also People v. Schwimmer*, 66 A.D.2d 91, 411 N.Y.S.2d 922, 926 (1978) ["A person is guilty of conspiracy ... when ... he agrees ..."]; and *State v. Felkins*, 156 Ariz. 37, 749 P.2d 946 (App. 1988); *but see People v. Foster*, 99 Ill.2d 48, 75 Ill.Dec. 411, 457 N.E.2d 405 (1983), and *Williams v. State*, 646 S.W.2d 221 (Tex.Cr.App.1983).

Rambousek urges us to follow several federal cases which accept the bilateral theory of conspiracy. *E.g., United States v. Escobar De Bright*, 742 F.2d 1196 (9th Cir.1984); *United States v. Hoffner*, 777 F.2d 1423 (10th Cir.1985). However, the federal statute construed in those cases, 18 U.S.C. § 371, uses the traditional bilateral conspiracy language. *See* n. 3, *supra*. North Dakota's conspiracy statute is nothing like its federal counterpart and, therefore, these federal cases are inapposite.

Rambousek also points to two state decisions construing as bilateral conspiracy statutes that use unilateral language. We find those cases unpersuasive.

In *Foster, supra*, the Illinois Supreme Court interpreted as bilateral a recently adopted conspiracy statute with the wording, "[a] person commits conspiracy when ... he agrees with another to the commission of that offense" which replaced a statute with traditional bilateral language. 75 Ill.Dec. at 413, 457 N.E.2d at 407. The Illinois court acknowledged that other jurisdictions had interpreted similar conspiracy statutes as requiring only a unilateral agreement, but was troubled by the lack of any explicit legislative history which showed that the Illinois legislature intended that the new statute change the tradi-

tional bilateral conspiracy doctrine to the unilateral approach. *Id.* We are not faced with such a dilemma as we have the unequivocal comments from the drafters of the proposed Federal Criminal Code.

The second case, *Williams, supra*, defined agreement as "the union of two or more minds in a thing done or to be done. A coming or knitting together of minds ... a mutual assent to do a thing." 646 S.W.2d at 223. Because the co-conspirator in the case, a police informant, secretly feigned a "meeting of the minds" throughout the conspiracy, the Texas court reasoned that there was no criminal intent by both parties and thus, no conspiracy. *Id.*

However, we believe the definition of "meeting of the minds" is more complex. We have previously noted, in another context, that the phrase "meeting of the minds" is often misleading. *See Amann v. Frederick*, 257 N.W.2d 436 (N.D.1977). In *Amann*, a civil case, we clarified the meaning of "meeting of the minds." It is not the actual subjective intentions of the parties to a contract that are relevant, but the manifestations of the parties' assent. These manifestations of assent govern, "not the secret intentions of the parties." *Id.* at 439. In a criminal case, there must be at least one individual other than the defendant when the defendant "agrees" to commit a criminal offense. And clearly, a criminal defendant may argue to the jury that his secret intent was not to do what, in fact, it appeared that he did. That is a matter for the jury. However, our legislative history clearly supports the view that the word "agreement" within NDCC § 12.1-06-04(1) focuses upon the individualized intent and conduct of the defendant-conspirator, regardless of any secret intent of co-conspirators. *Accord Garcia*, 394 N.E.2d at 110.

Rambousek also poses several policy arguments in favor of a bilateral approach to conspiracy. He says that conspiracy statutes are aimed at the increased danger to society presented by secretive criminal behavior, but that a person "conspiring" with a governmental agent causes no public danger. He argues, in essence, that:

> "Such dangers, however, are non-existent when a person 'conspires' only with

a government agent. There is no continuing criminal enterprise and ordinarily no inculcation of criminal knowledge and practices. Preventive intervention by law enforcement officers also is not a significant problem in such circumstances. The agent, as part of the 'conspiracy' is quite capable of monitoring the situation in order to prevent the completion of the contemplated criminal plan; in short, no cloak of secrecy surrounds any agreement to commit the criminal acts.

"Finally [a rule that there can be no indictable conspiracy with a government agent who secretly intends to frustrate the conspiracy] responds to the same concern that underlies the entrapment defense: the legitimate law enforcement function of crime prevention 'does not include the manufacturing of crime.' (Citations omitted.) Allowing a government agent to form a conspiracy with only one other party would create the potential for law enforcement officers to 'manufacture' conspiracies when none would exist absent the government's presence." *Escobar De Bright*, 742 F.2d at 1199–1200.

It may be less dangerous to society to conspire with a person who merely feigns agreement to the conspiracy than with a person who actually agrees and intends to commit the offense. But the enterprise of weighing the danger is for the legislature, the policy-making branch of government. Rambousek's arguments are better directed to it.

Accordingly, we affirm the judgment.

ERICKSTAD, C.J., and MESCHKE and VANDE WALLE, JJ., concur.

Justice H. F. GIERKE, a member of the Court when this case was heard, resigned effective November 20, 1991, to accept appointment to the United States Court of Military Appeals and did not participate in this decision.