2008 ND 219

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Jeff Emanuell MOSBRUCKER, Defendant and Appellant.**

**No. 20070355.**

Supreme Court of North Dakota.

Dec. 16, 2008.

## I.

[¶ 2]   In August 2006, Mosbrucker and Jane Doe, who was eighteen years old at the time, had sex outside her parent's home.   Mosbrucker was charged with gross sexual imposition for engaging in a sexual act with Doe, whom the State alleged was forced into the sexual act or had a mental disease or defect rendering her incapable of understanding the nature of the conduct.   Mosbrucker's first trial in March 2007 ended in a mistrial and a second trial was held in July 2007.

[¶ 3]   At the close of the State's case-in-chief, Mosbrucker moved for a judgment of acquittal.   It was partially granted as to the allegation that Doe was forced into the sexual act, with the jury deciding only whether Mosbrucker knew or had reasonable cause to believe Doe suffered from a mental disease or defect rendering her incapable of understanding the nature of the conduct.   The jury found Mosbrucker guilty of gross sexual imposition.   Following his trial, Mosbrucker made a motion for a new trial on the grounds that the verdict was not supported by the greater weight of the evidence.   The motion was subsequently denied by the trial court.

## II.

[¶ 4]   Mosbrucker argues his conviction should be reversed because the trial court committed obvious error by allowing Dr. DeGree to testify regarding Doe's ability to consent to sexual acts and her ability to understand the implications of engaging in sexual acts.

[¶ 5]   Dr. DeGree testified he reported the incident because Doe told him she had not intended to have sexual relations and because he thought she would have difficulty giving consent due to her lack of mental capability.   When asked if Doe had a mental disease or defect rendering her incapable of understanding the nature of

Allen M. Koppy (on brief), State's Attorney, and Brian D. Grosinger (argued), Assistant State's Attorney, Mandan, ND, for plaintiff and appellee.

Wayne D. Goter, Bismarck, ND, for defendant and appellant.

VANDE WALLE, Chief Justice.

[¶ 1]   Jeff Mosbrucker appealed from a criminal judgment entered after being found guilty of gross sexual imposition following a jury trial.   We affirm.

the conduct, Dr. DeGree explained that Doe might understand the act of sexual intercourse but would have difficulty understanding the implications of it. He said Doe would have extreme difficulty understanding sexually transmitted diseases, becoming pregnant and "the social relationships you have to understand and negotiate in order to engage in [sex]." When asked whether Doe could consent to the act of sex, Dr. DeGree stated:

> [T]he trouble I have with that is she would not understand the implications of it, having sexually transmitted diseases, being pregnant, having consenting sex with somebody who may not be a good partner. She would have serious limitations on that.

[¶ 6] Mosbrucker objected to the testimony at trial as irrelevant. The trial court overruled the objection. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. N.D.R.Ev. 401. Under N.D.R.Ev. 401 through 403, a trial court is vested with broad discretion to decide if evidence is relevant and if its probative value is substantially outweighed by the danger of unfair prejudice. *State v. Carlson*, 1997 ND 7, ¶ 8, 559 N.W.2d 802. We apply an abuse of discretion standard of review to a district court's evidentiary rulings and will not reverse the court's ruling unless it is arbitrary, capricious, or unreasonable, or a misinterpretation or misapplication of the law. *State v. Wegley*, 2008 ND 4, ¶ 12, 744 N.W.2d 284.

[¶ 7] Mosbrucker argues the testimony regarding whether Doe could consent to the sexual act or understand the implications of having sex were irrelevant in determining whether she had a mental disease or defect rendering her incapable of understanding the nature of the conduct. He asserts the testimony regarding Doe's understanding of the physical act of sexual intercourse was sufficient to establish she was capable of understanding the nature of the conduct.

[¶ 8] Section 12.1–20–03(1)(e), N.D.C.C., provides:

1. A person who engages in a sexual act with another, or who causes another to engage in a sexual act, is guilty of an offense if:

. . . .

e. That person knows or has reasonable cause to believe that the other person suffers from a mental disease or defect which renders him or her incapable of understanding the nature of his or her conduct.

[¶ 9] It is necessary for us to ascertain what "incapable of understanding the nature of his or her conduct" entails and, consequently, what evidence is relevant to the issue. Legislative history is silent and there is no case law in our jurisdiction discussing the meaning of this particular statutory language. However, case law in other jurisdictions with similar statutory language is helpful in ascertaining what evidence is relevant in determining whether a victim was capable of understanding the nature of a sexual act.

[¶ 10] In determining the meaning of the words "incapable of understanding the nature of his or her conduct," decisions in other jurisdictions have recognized the tensions between the individual's right to sexual freedom and the society's interest in protecting the individual with a mental disease or defect. Elizabeth Reed, *Criminal Law and the Capacity of Mentally Retarded Persons to Consent to Sexual Activity*, 83 Va. L.Rev. 799, 806 (1997). Although most jurisdictions agree that consent means knowing, intelligent and

voluntary agreement to engage in sexual activity, courts disagree as to the degree to which these factors must be determined and have resulted in three definitions courts have used to define mental incapacity so as to render the person incapable of understanding the nature of his or her conduct. *Id.* at 813.

[¶ 11] The majority position interprets the standard of incapable of understanding the nature of his or her conduct to mean that the person does not know either the physiological aspects of sex or the possible consequences of sexual activity, such as pregnancy and the contraction of sexually transmitted diseases. A few jurisdictions have interpreted the term to have a broader meaning and, in addition to understanding of the sexual act involved and its consequences, also require that the person must appreciate the moral dimensions of the decision to engage in sexual conduct although the person is free to act contrary to those societal ideas. Finally, one jurisdiction, New Jersey, has established the most limited interpretation and, while requiring the person understand the nature and the voluntariness of the action does not require the person understand the risk and consequences of sexual conduct. *Id.* at 813–14.

■ [¶ 12] An example of the broad definition is *People v. Easley,* 42 N.Y.2d 50, 396 N.Y.S.2d 635, 364 N.E.2d 1328, 1332 (1977). A valid inquiry in determining whether one is so mentally defective as to trigger protection under the law is whether there is an awareness of the social or other cost of one's conduct. *Id.* at 1333. To appreciate the nature and consequences of engaging in an act of sexual penetration, the victim must have the capacity to understand the full range of ordinary and foreseeable social, medical and practical consequences that the act entails. *See also State v. Soura,* 118 Idaho 232, 796

P.2d 109 (1990); *People v. Gross,* 670 P.2d 799, 801 (Colo.1983) (holding victim incapable of understanding how sexual conduct will be regarded within the framework of the societal environment of which is a part or is not capable of understanding the physiological implications of sexual conduct is incapable of "appraising the nature of her conduct" under the language of the statute.).

[¶ 13] New Jersey has taken the approach that the voluntariness of the action requires the person to understand only the nature of the act and that one need not consent to the act for the carnal gratification of another, but does not require the person to understand the risk and consequences of sexual conduct. *State v. Olivio,* 123 N.J. 550, 589 A.2d 597 (1991).

[¶ 14] Other jurisdictions have used an intermediate construction requiring that the person understand the nature of the sexual act as well as its consequences such as pregnancy and sexually transmitted diseases but not the moral nature of their participation in the act of intercourse. Thus, in *Jackson v. State,* 890 P.2d 587, 592 (Alaska Ct.App.1995) the court found a victim was incapable of understanding a sexual act although the victim knew a baby came from having sex and could demonstrate a sexual act using dolls, but did not understand birth control, sexually transmitted diseases, how to prevent pregnancy or the practical consequences of a pregnancy. *See also Stafford v. State,* 455 N.E.2d 402, 405–06 (Ind.Ct.App.1983) (holding "capacity to consent presupposes an intelligence capable of understanding the act, the nature and possible consequences.") In *Stafford,* the court relied on *People v. McMullen,* 91 Ill.App.3d 184, 46 Ill.Dec. 492, 414 N.E.2d 214, 217 (1980), in which the Illinois court affirmed the conviction, adopting the standard that capacity to consent presupposes an intelligence

capable of understanding the act, its nature and its consequences and, coupling it with the standard of review on appeal, concluded beyond a reasonable doubt the victim was unable to give consent though she did have some understanding of the physical nature of sexual activity and "where babies came from."

[¶ 15] The language of our statute "incapable of understanding the nature of his or her conduct" arguably may be broad enough to encompass the moral and societal consequences of sexual intercourse. However we believe that would be an amorphous construction of the statutory language and we decline to adopt it. But the statutory language is surely broad enough to encompass knowledge of the practical consequences of sexual intercourse such as unwanted pregnancy and sexually transmitted diseases, and we conclude the intermediate construction better reflects the legislative intent to balance the individual's right to sexual freedom with society's interest in protecting the individual with a mental disease or defect from conduct the nature of which he or she is incapable of understanding.

[¶ 16] Dr. DeGree's testimony addressed Doe's difficulty with specific implications and consequences, such as pregnancy and sexually transmitted diseases. Therefore, his testimony was relevant to an important issue in the case, as it made it more probable that Doe had a mental disease or defect rendering her incapable of understanding the nature of the conduct. We conclude the trial court did not abuse its discretion in admitting the testimony as relevant under N.D.R.Ev. 401.

[¶ 17] Mosbrucker also argues the probative value of the evidence, if relevant, is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading of the jury. He asserts the jury was misled by the testimony into convicting Mosbrucker because Doe could not consent to the sexual act, rather than because Doe had a mental disease or defect rendering her incapable of understanding the conduct as the statute requires.

[¶ 18] Evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury. N.D.R.Ev. 403. Because Mosbrucker failed to object to the evidence on this ground at trial, we do not reverse unless the admission of the evidence was obvious error. *Hawes v. N.D. Dept. of Transp.*, 2007 ND 177, ¶ 10, 741 N.W.2d 202. To establish obvious error, a defendant must show 1) an error, 2) that is plain, and 3) that affects substantial rights. *Wegley* at ¶ 14. An alleged error does not constitute obvious error unless it is a clear deviation from an applicable legal rule under current law. *Id.* To affect substantial rights, a plain error must have been prejudicial or have affected the outcome of the proceeding. *Id.* Analyzing obvious error requires examination of the entire record and the probable effect of the alleged error in light of all the evidence. *Id.* Even if a defendant establishes obvious error affecting substantial rights, the decision to correct the error lies within this Court's discretion and will be done only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*

[¶ 19] Here, Dr. DeGree offered valuable insight into Doe's understanding of the implications and consequences of engaging in sexual acts. His testimony was that Doe would have difficulty having consenting sex with a good partner and that he reported the incident to police because he felt Doe would have difficulty consenting to sexual intercourse. Dr. DeGree did not testify as to what is needed to consent to sex nor did he testify that Doe could not

legally consent to sex. Instead, questioning of Dr. DeGree focused on whether Doe had a mental disease or defect rendering her incapable of understanding the nature of the conduct, as evidenced by multiple questions regarding her mental capacity. Under these circumstances, the probative value of the evidence exceeds any unfair prejudice that might arise out of admission of the evidence. We, therefore, conclude the trial court's decision to admit Dr. DeGree's testimony was not an obvious error.

### III.

[¶ 20] Mosbrucker argues his conviction should be reversed because the evidence was insufficient to sustain the guilty verdict.

[¶ 21] The defendant bears the burden of showing the evidence reveals no reasonable inference of guilt when viewed in the light most favorable to the verdict. *State v. Igou*, 2005 ND 16, ¶ 5, 691 N.W.2d 213. When sufficiency of the evidence to support a criminal conviction is challenged, this Court reviews the record to determine if there is competent evidence allowing the jury to draw an inference reasonably tending to prove guilt and fairly warranting a conviction. *Id.* A conviction rests upon insufficient evidence only when no rational factfinder could have found the defendant guilty beyond a reasonable doubt after viewing the evidence in a light most favorable to the prosecution and giving the prosecution the benefit of all inferences reasonably to be drawn in its favor. *Id.*

[¶ 22] Viewing the evidence in a light most favorable to the prosecution, there is a reasonable inference of guilt supporting the verdict. Along with the testimony previously discussed, Dr. DeGree testified that Doe has a mental age between nine and eleven years old and is subject to exploitation, especially by someone such as Mosbrucker, who would be viewed by Doe as an authority figure. He testified Doe might agree to sex because it is something she feels she has to do. While Mosbrucker claimed he was not aware of any handicap other than Doe's Attention Deficit Hyperactivity Disorder, Detective McClure testified there were obvious signs of deficit in Doe when speaking with her and Mosbrucker had lived with Doe and her family for part of the year for the past two years.

[¶ 23] Also, the jury had the opportunity to see and hear Doe testify. Although Doe did testify about knowing she could become pregnant from sex, she did say she was warned by her parents not to have sex and told she could become pregnant from having sex. The jury could reasonably conclude from the testimony that Doe's knowledge of pregnancy came solely from her parents. Evidence explaining what the victim knows and how the victim came to know it may well give rise to an inference of incapacity. *Jackson*, at 592. Based on our review of the record, we conclude there is competent evidence to support the verdict.

### IV.

[¶ 24] Mosbrucker argues the trial court abused its discretion in denying his motion for a new trial because the guilty verdict was against the greater weight of the evidence. Under N.D.C.C. § 29–28–06, an appeal may be taken by the defendant from an order denying a motion for a new trial. Mosbrucker's notice of appeal states that he is appealing the criminal judgment dated November 8, 2007, which does not deny his motion for a new trial. The order denying the motion for a new trial was not issued until November 9, 2007. Mosbrucker did not reference the November 9, 2007 order in his notice of appeal nor did he file an amended or additional notice of appeal.

[¶ 25] The remedies afforded by appeal from a judgment and appeal from an order denying a new trial are independent remedies. *Nevland v. Njust,* 78 N.D. 747, 51 N.W.2d 845, 848 (1952). Not only have we said the rules of procedure and the statutes confirming the right to appeal do not contemplate or sanction a cursory treatment of the important process of perfecting an appeal, *Everson v. Northland Life Ins. Co.,* 329 N.W.2d 592, 595 (N.D.1983), the filing of a notice of appeal is jurisdictional. *State v. Neigum,* 369 N.W.2d 375, 377–78 (N.D.1985). Because Mosbrucker did not file an amended or additional notice of appeal from the order denying his motion for a new trial, we are without jurisdiction to review the order.

[¶ 26] We affirm.

[¶ 27] MARY MUEHLEN MARING and DANIEL J. CROTHERS, JJ., concur.

KAPSNER, Justice, concurring in the result.

[¶ 28] I concur in the result, but I do not join in the adoption of what is described as the intermediate position.

[¶ 29] Rather, our statute and prior case law dictate that we follow an approach more closely aligned with New Jersey as described in paragraph 13 of the majority opinion—that a person must understand the nature of the act and that one need not engage in the act for the carnal gratification of another. As the New Jersey court has stated, "it involves an inquiry into whether or not the complainant could appreciate the inviolability of her person and that others could not, without her consent, invade her person for carnal gratification." *State v. Olivio,* 237 N.J.Super. 428, 568 A.2d 111, 112 (1989). Put more simply, does the victim understand that she has a right to say, "No"? This right is inherent in the concept of consent.

[¶ 30] In the later case of *State v. Olivio,* 123 N.J. 550, 589 A.2d 597, 599 (1991), the Supreme Court of New Jersey expanded on this application of the statute under which Olivio was convicted:

These significant policy considerations commend a narrow interpretation of the concept of mentally defective under [N.J. Stat. Ann.] 2C:14–1h. The statutory concept of "mentally defective" implicates both the intellectual or cognitive capacity and the volitional or consensual capacity of the individual with respect to personal sexual activity. The consensual capacity involves knowing that one's body is private and is not subject to the physical invasions of another, and that one has the right and ability to refuse to engage in sexual activity. The cognitive capacity, which is also implicit in the notion of consensual capacity, involves the knowledge that the conduct is distinctively sexual. In the context of this criminal statute, that knowledge extends only to the physical or physiological aspects of sex; it does not extend to an awareness that sexual acts have probable serious consequences, such as pregnancy and birth, disease, infirmities, adverse psychological or emotional disorders, or possible adverse moral or social effects.

*Olivio,* 589 A.2d at 604–05.

[¶ 31] The approach is consistent with the decision of this Court in *State v. Kingsley,* 383 N.W.2d 828 (N.D.1986). In that case, the convictions for gross sexual imposition were affirmed because:

[the victims'] testimony, together with that of social worker Marian Sorenson, quite clearly demonstrates that they were incapable of understanding or appreciating the nature of what was taking place or that they had any ability to stop or otherwise cope with the activity that

was, in effect, being unilaterally perpetrated upon them.

*Id.* at 830.

[¶ 32] The jury saw Doe testify and could evaluate her understanding of the act. As noted in paragraph 22 of the majority opinion, Dr. Degree testified that Doe is subject to exploitation and might "agree" to sex because that is something she feels she has to do when approached by someone she would regard as an authority figure. Mosbrucker had been living at Doe's home. From this, the jury might have found that Doe suffers from a mental disease or defect that rendered her incapable of understanding the nature of her conduct because she didn't understand that she could refuse to engage in sex.

[¶ 33] Given our standard of review of jury verdicts, there was evidence to sustain the conviction.

[¶ 34] CAROL RONNING KAPSNER

SANDSTROM, Justice, dissenting.

[¶ 35] Because the majority opinion criminalizes what is not included in the plain language of the statute, I respectfully dissent.

## I

[¶ 36] Section 12.1–20–03(1)(e), N.D.C.C., provides:

1. A person who engages in a sexual act with another, or who causes another to engage in a sexual act, is guilty of an offense if:

. . . .

e. That person knows or has reasonable cause to believe that the other person suffers from a mental disease or defect which renders him or her incapable of understanding the nature of his or her conduct.

[¶ 37] The central question here is whether the alleged victim was capable of understanding the "nature of the conduct." The legislature has told us words are understood in their ordinary sense unless a contrary meaning plainly appears. N.D.C.C. § 1–02–02. The "nature" of something is defined as the "(a) essential character or constitution" or "(b) distinguishing qualities or properties." *Webster's Third New Int'l Dictionary of the English Language Unabridged* 1507 (16th ed.1971). Black's Law Dictionary defines "nature" as "1. A fundamental quality that distinguishes one thing from another; the essence of something." *Black's Law Dictionary* 1050 (7th ed.1999).

[¶ 38] Words must be construed according to the context in which they appear. N.D.C.C. § 1–02–03. This Court interprets statutes as a whole. *Maurer v. Wagner*, 509 N.W.2d 258, 260 (N.D.1993). Section 12.1–20–03, N.D.C.C., punishes a person who engages in a "sexual act" with another or causes another to engage in a "sexual act." The definition of "sexual act" as contained in N.D.C.C. § 12.1–20–02 refers only to the mechanics of the act. In *State v. Kingsley*, 383 N.W.2d 828, 830 (N.D.1986), this Court explains the phrase "of understanding the nature of his or her conduct" by saying the victims "were incapable of understanding or appreciating the nature of what was taking place or that they had any ability to stop or otherwise cope with the activity that was, in effect, being unilaterally perpetrated upon them." The Court emphasized that this lack of understanding must be by reason of mental disease or defect. *Id.* Thus, applying these rules of construction, requiring that a victim under N.D.C.C. § 12.1–20–03(1)(e) not understand all the consequences and implications of sexual relations when she understands the mechanics, the nature of what is taking place and the right to stop

the activity, criminalizes more than what the statute intended.

[¶ 39] Although the majority has often told us the primary goal in discerning the meaning is to determine the intent of the legislation, looking first to the plain meaning of the words and then, if there is ambiguity, looking to things such as the history of our legislation, here the majority looks neither to the plain meaning of the words nor to the history of our legislation. The majority never discusses *Kingsley*. Instead, it looks to the interpretation of different statutory language enacted by other states' legislatures and interpreted by other states' courts.

[¶ 40] In its discussion of the intermediate interpretation in ¶ 14, the majority cites an Alaska case which dealt with a statute that explicitly requires that the victim be "incapable of understanding the nature *or consequences* of the person's conduct." Alaska Stat. § 11.41.470(4) (emphasis added). Moreover, the case from Illinois also cited in support of an intermediate construction was more in line with the broad definition of "understanding the nature of his or her conduct" adopted in *People v. Easley*, 42 N.Y.2d 50, 396 N.Y.S.2d 635, 364 N.E.2d 1328 (1977). *People v. McMullen*, 91 Ill.App.3d 184, 46 Ill.Dec. 492, 414 N.E.2d 214, 217 (1980).

[¶ 41] If we were to appropriately look to other states, our statute is more in line with New Jersey's definition of "mentally defective" at issue in *State v. Olivio*, 123 N.J. 550, 589 A.2d 597 (1991), which limits its protection to persons who are incapable of understanding the nature of the conduct because of a mental disease or defect. N.J. Stat. Ann. 2C:14–1h. Acknowledging the difficulty in determining "how much or how little knowledge of sex should be ascribed to a person in order for that person to be considered 'mentally defective' under [N.J. Stat. Ann. 2C:14–1h]," the New Jer-

sey Supreme Court stated that knowledge in this context extends "only to the physical or physiological aspects of sex, [and not] to an awareness that sexual acts have probable serious consequences, such as pregnancy and birth, disease, infirmities, adverse psychological or emotional disorders, or possible adverse moral or social effects." *Olivio*, 589 A.2d at 602, 605. Under this limited interpretation, the test entails knowledge of the act's distinctive sexual nature and an understanding of and ability to assert the right to refuse to engage in sex, free of any analysis of the victim's understanding of possible consequences. *Id.* at 599.

[¶ 42] Finally, it is a well-settled rule of statutory construction that any ambiguity in a criminal statute must be resolved in favor of the defendant. *E.g., State v. Rambousek*, 479 N.W.2d 832, 834 (N.D. 1992).

## II

[¶ 43] The record does not support the result reached by the majority or concurring opinions.

[¶ 44] Mosbrucker's argument is stated in ¶ 7 of the majority's opinion: "Mosbrucker argues [Dr. Degree's] testimony regarding whether Doe could consent to the sexual act or understand the implications of having sex were irrelevant in determining whether she had a mental disease or defect rendering her incapable of understanding the nature of the conduct."

[¶ 45] Dr. Degree's testimony focused on Doe's ability to understand the social and health implications of sexual intercourse and her ability to decide whether defendant was an appropriate person with whom to have a relationship. When Dr. Degree testified about Doe's ability to consent to sex, his response revolved around Doe's inability to understand the potential

social and health problems and not whether she understood that her body is inviolable. When asked whether Doe was able to understand "what the act of sexual intercourse would be," he responded, "I believe she would." He testified Doe "may agree to have sex because it is something that she feels that she has to do to keep him, without thinking whether this person is someone you should have a sexual relationship with." This statement could, however, describe many situations in which the persons involved do not suffer from any mental defect or disease. At issue is not the wisdom in Doe's choice of sexual partner, but whether she understood what she was doing.

[¶ 46] The record indicates that Doe knew and understood the distinctively sexual nature of the conduct and that she could say no. She testified she knew what sex is and knew the mechanics of it. She also testified that on the night she and the defendant were having sex, she was aware of what she was doing, but it was not something they had discussed prior to its happening. According to her testimony, she did not want to have sex. Thus, if it were true that Doe is subject to exploitation and might "agree" to sex because it is something she has to do when approached by someone she regards as an authoritative figure, as Dr. Degree testified, and Doe did not understand she could refuse to engage in sex, as the concurrence suggests, then Doe would not have resisted; she would just have complied. Instead, she testified she tried to push the defendant off of her but she could not because he was "too big." This shows she understood that she could refuse. Moreover, the nurse who examined Doe testified that when she asked Doe what she meant by sexual assault, Doe explained she had sex against her will. This, too, shows Doe understood she had a right to refuse.

[¶ 47] Doe further testified she told her father about what had happened the next day. According to her father's testimony, she told him, "Dad, I did something that I'm embarrassed about. Jeff and I had sex last night." He further testified about asking her why she did it, to which she apparently responded that she was curious about it. He testified he and Doe's mother had previously talked to Doe about sex and its implications—"she knew she could get pregnant." According to his and Doe's testimony, one of Doe's sisters had been in trouble for having sex without being married.

[¶ 48] Doe's testimony reflects she did not complain to her father; she just told him what had happened, even expressing her desire to be in a girlfriend-boyfriend relationship with the defendant. The evidence supports the conclusion that Doe might have told her father in part out of fear of being pregnant and its possible consequences because Doe's mother had allegedly told her that if she were to have sex without being married, she would have to leave the house. Moreover, Doe did not seek medical assistance until two weeks after the incident, and even then, although she was then alleging she had been sexually assaulted, her main fear was the risk of being pregnant—according to the nurse's testimony, Doe was "very fearful of pregnancy." The nurse also testified that her examination of Doe was strictly medical—whether Doe had contracted any sexually transmitted disease or was pregnant—and not for the preservation of any evidence of sexual assault.

[¶ 49] In conclusion, the record does not support defendant's conviction under N.D.C.C. § 12.1–20–03(1)(e). The evidence shows Doe understands the distinctive nature of a sexual act and even its possible implications as well as her right to refuse to engage in sex.

## III

[¶ 50] The record here reflects that Doe had a substantially greater understanding than the victims in *State v. Kingsley*, 383 N.W.2d 828 (N.D.1986). In *Kingsley*, at 830, the majority said the record:

> quite clearly demonstrates that they were incapable of understanding or appreciating the nature of what was taking place or that they had any ability to stop or otherwise cope with the activity that was, in effect, being unilaterally perpetrated upon them. The lack of understanding is especially evident by Pamela's testimony that Kingsley "started doing sexual education with me." Sharon's lack of understanding is equally demonstrated by her testimony that she did not understand what Kingsley "was doing or why."

As Justice Levine, *id.* at 831, wrote in her special concurrence:

> It is well to bear in mind that there is no presumption of incompetence simply because a developmentally disabled person is receiving special services or living at a residence for the developmentally disabled. North Dakota Century Code § 25–01.2–03. Nor is a developmentally disabled person deprived of the right to "interact" with members of the opposite sex. NDCC § 25–01.2–03(3).

## IV

[¶ 51] I would reverse the criminal judgment.

[¶ 52]   DALE V. SANDSTROM