[No. B224163. Second Dist., Div. Five. Oct. 18, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT FRANK MIRANDA, Defendant and Appellant.

**COUNSEL**

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Susan Sullivan Pithey and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KRIEGLER, J.**—We hold that substantial evidence supports the jury's findings that the 15-year-old sexual assault victim, who suffered from cerebral palsy resulting in severe communication difficulties combined with physical disabilities, was mentally incapable of consenting to the sexual offenses committed upon her by defendant. Defendant's additional contentions regarding insufficiency of the evidence, prejudicial exclusion of evidence of a prior false accusation of sexual assault, instructional error, and denial of equal protection in requiring lifetime registration as a sex offender, are also unmeritorious. We affirm.

Defendant and appellant Robert Frank Miranda was convicted of the following offenses upon Jane Doe, a person physically or mentally incapable of giving consent: count 1—attempted rape (Pen. Code, §§ 664, 261, subd. (a)(1));[1] count 2—oral copulation (§ 288a, subd. (g)); and count 3—sexual penetration (§ 289, subd. (b)). The trial court sentenced defendant to 11 years in state prison.

## FACTS

*Prosecution Evidence*

Fifteen-year-old Jane Doe slept in a trailer with her father and 13-year-old brother, Vincent, on a Sunday night in October 2008. Someone sleeps with

---

[1] Statutory references are to the Penal Code unless otherwise stated.

Jane for her safety, because she has cerebral palsy that results in numerous seizures. After the father left for work between 4:00 and 5:00 a.m. on Monday morning, defendant, who is grandfather to Jane and Vincent, entered the trailer. Defendant directed Vincent to one of the beds, while defendant got into bed with Jane. Vincent believed defendant came to the trailer to take care of his sister.

Vincent soon heard the sound of a female moaning. Defendant was under the blankets, which were moving, with Jane beneath him. When the blankets moved off defendant, Vincent saw defendant with his head close to "her privates," between her knees, licking her. Defendant's head moved up and down, and a bit later, Vincent saw defendant's fingers entering a split in the boxer shorts worn by Jane in the area of her "privates." Defendant asked Jane several times if she liked that. Vincent definitely saw defendant's fingers touching his sister, but he could not actually see if defendant's tongue touched her "privates." Vincent thought defendant, who was wearing boxer shorts, had an erection. Defendant put the blankets back over himself and was again on top of Jane. About 15 minutes later defendant's wife came home, after dropping off other grandchildren at school. After defendant walked out of the trailer, Vincent noticed a salty, fishy smell in the trailer. Vincent asked Jane if defendant had done anything. She made a gesture which Vincent understood to mean he should not say anything because defendant would get mad.

Direct examination of Jane before the jury consumed six pages of reporter's transcript. A number of leading questions were asked, as permitted by the trial court, without objection by defense counsel.[2] With the exception of three answers, Jane's verbal responses on direct examination were one word consisting of a single syllable.[3] At least seven of her answers were inaudible or unintelligible.

Jane testified she would tell the truth in court, and when asked if she would lie, she moved her head from left to right, which the prosecutor described as indicating "no." The trial court explained to the jurors that they were in "the best position" to see what was happening and to "use your own evaluation" as matters were described for the record. Using a blue marking pen and a simple diagram of a young girl, Jane made shaky markings on the girl's

---

[2] Examples of some of the leading questions on direct examination included the following: "You're going to promise to tell us the truth today, right?"; "The person just talking was the judge, right?"; and "This is a picture of a little girl, right?"

[3] The three exceptions were "Yeah, Vincent," referring to her brother, "Yeah. A girl," and "Yeah. Bob—Bob—he—," referring to defendant.

breasts and vagina to indicate where she had been touched by defendant. On a similar diagram of a boy, she placed marks just below the mouth and on the area of the penis to indicate what body parts defendant had used to touch her. When asked if defendant used his mouth to touch her, she stuck out her tongue and nodded "yes." She held up 10 fingers when asked if defendant had touched her more than once.

The cross-examination of Jane by defense counsel, also consisting of six pages in the reporter's transcript, followed the same pattern as her direct testimony. The majority of her verbal answers consisted of one word and one syllable. On a few occasions she gave two-word answers ("Yeah. Yeah" or "Yeah. Right."). She gave one three-word answer—"I don't know." There were at least 10 questions to which there was either an inaudible or unintelligible response. Jane testified that the molestation occurred in 2008, but she first told someone in March 2009.[4] Defendant was wearing boxer shorts. She saw defendant's penis, which was big.

In his testimony, Vincent described Jane as walking "a little bit slower," but he can talk and interact with her. Jane's brain cannot make her tongue work when she talks due to her cerebral palsy. She goes to a special education school, where she is a sophomore, although Vincent does not know what she is being taught or at what level.

Detective John Selby, a deputy sheriff for 27 years (including 13 years in the special victims bureau), was the investigating officer. He reviewed the report of the sexual assault, after Jane first reported the abuse by defendant to a teacher. The deputy who took the report interviewed Jane and Vincent. Detective Selby arranged for them to be interviewed at the Children's Advocacy Center "because of the condition of . . . our victim." The center specializes in forensic interviews in a nonintimidating setting, outside the

---

[4] The dates were established through the following questions and answers on cross-examination:

"Q Now you—this happened sometime in October?
"A Yeah.
"Q Of 2008; correct?
"A Yeah.
"Q Is that right?
"A Yeah. Right.
"Q And you told somebody—you didn't tell anybody, did you?
"A Yeah.
"Q Well, is the first person you told your teacher in March of 2009?
"A Yeah.
"Q So between October and March 2009, you didn't tell anybody, did you?
"A (No audible response.)"

presence of uniformed law enforcement officers. The interviews were observed by the detective and prosecutor. Detective Selby did not conduct a followup interview, because the interview statements of Jane and Vincent were consistent with the initial report in the case. The report said Jane was wearing pajama bottoms, not boxer shorts. Jane was not subjected to a physical exam. The specialists in sexual assault examinations recommended against a physical examination due to the passage of time between the incident and the report.

*Defense Evidence*

Defendant and his wife confirmed that the children's father slept with the children in the trailer on Sunday night, he left for work early in the morning, and due to her cerebral palsy, Jane is not allowed to sleep alone because she has seizures. Defendant went to the trailer, wearing pajamas or sweatpants, to make sure Jane was okay after her father went to work. It was early in the morning and defendant did not want her to be unattended if she had a seizure.

When he entered the darkened trailer, defendant found Jane on the sofa bed where she slept with her father, and Vincent was in the back bed with the curtains closed. Defendant climbed into bed with Jane, facing the wall, leaving room for her to get up if she wished. One time Jane jumped out of bed, defendant asked if she was okay, and she said yes and returned to bed. She next awoke when Vincent got up and said he was going to eat. Defendant remained with her in the trailer until 7:00 to 7:15 that morning.

Defendant did not sexually molest his granddaughter. Jane, who has been in therapy her entire life, was being manipulated into saying she was molested. He never did anything to her, and he does not know why Vincent testified as he did, other than not wanting to move in with defendant.[5]

Defendant was impotent in October 2008. It was not possible for him to have an erection due to diabetes and radiation treatment for cancer. Defendant did ask a doctor for Viagra, but it did not help. This would be documented in his medical records.[6]

Defendant's wife saw defendant at approximately 7:00 a.m., when she went to ask if he would like a cup of coffee. Jane was asleep in the trailer, but

[5] Vincent testified in the prosecution case that his father had talked about him going to live with his grandparents due to problems at school. Vincent was having some problems in school at that time, but he did not intend to live with his grandparents.

[6] No medical records were introduced at trial.

Vincent had already come into the living room of the house. Defendant's wife left briefly around 7:45 to 7:50 a.m. to take other grandchildren to school. When she returned five minutes after dropping off the children at school, defendant was in the house with Vincent and Jane.

Jane and Vincent were supposed to go home on Sunday, but their mother failed to cooperate in picking them up, which was not unusual, so they stayed over to Monday. Defendant had a telephone conversation with their mother, in which he said he was tired of her not showing up and she was a bad mother who had abandoned her children. Defendant eventually took the children to Victorville, where they were picked up by their mother.

Defendant's wife found two empty beer cans stuffed under the dryer in the trailer, as well as a water bottle containing what she thought was two ounces of tequila. She did not believe these items were left there by the children's father, as he had no reason to hide alcoholic containers, and he usually drinks beer, not tequila.[7] The items were left in the trailer and photographed in March or April 2009 by an investigator.

Vincent's mother had spoken to defendant about Vincent coming to live with him because she could not control him. Defendant told Vincent if he was going to live with him he would have to follow all the rules, including doing his homework before going out to play. April 2009 was the first time defendant heard anything about molestation allegations in a phone conversation with Jane's mother. Defendant told her he had had nothing to do with that and he would not do that to her.

## DISCUSSION

### I. *Sufficiency of the Evidence*

Defendant argues the evidence was insufficient in various respects. He contends no evidence was presented that Jane lacked the capacity to consent to the sexual offenses due to a mental disorder. He also contends there was insufficient evidence that he attempted an act of sexual intercourse with Jane or that he penetrated her with his fingers. We hold that none of the challenges to the sufficiency of the evidence has merit.

### A. *Standard of Review*

In considering an appellate challenge to the sufficiency of the evidence, state law requires this court to "review the whole record in the light most

---

[7] In his testimony, Vincent denied drinking alcoholic beverages in the trailer.

favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) Under the due process clause of the Fourteenth Amendment, an appellate court must "determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 318 [61 L.Ed.2d 560, 99 S.Ct. 2781].) The reviewing court does not address whether it believes the evidence established guilt beyond a reasonable doubt. "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (*Id.* at pp. 318–319.)

The same standard of review applies to cases relying on circumstantial evidence. "[T]he judgment is not subject to reversal on appeal simply because the prosecution relied heavily on circumstantial evidence and because conflicting inferences on matters bearing on guilt could be drawn at trial. Although the jury is required to acquit ·a criminal defendant if it finds the evidence susceptible of two reasonable interpretations, one of which favors guilt and the other innocence, it is the jury, not the appellate court, which must be convinced of his guilt beyond a reasonable doubt. (*People v. Bean* (1988) 46 Cal.3d 919, 932–933 [251 Cal.Rptr. 467, 760 P.2d 996].) We review the entire record in the light most favorable to the judgment and affirm the convictions as long as a rational trier of fact could have found guilt based on the evidence and inferences reasonably drawn therefrom. (*People v. Johnson*[, *supra*,] 26 Cal.3d [at p.] 576 . . . .)" (*People v. Millwee* (1998) 18 Cal.4th 96, 132 [74 Cal.Rptr.2d 418, 954 P.2d 990].)

B. *Capacity to Consent*[8]

██ Defendant contends the evidence is constitutionally insufficient in all three counts to support a finding that Jane lacked the capacity to consent due

---

[8] The defense at trial was that there was no improper contact between defendant and Jane, not that Jane had the capacity to consent or that she did consent. The prosecutor argued to the jury that Jane lacked the mental capacity to consent, but defense counsel strategically did not address or contest this element of the charged offenses in argument. Suggesting that Jane had

to a mental disorder. The Attorney General does not argue that there is substantial evidence of mental incapacity, as argued by the prosecutor at trial, but instead contends there is substantial evidence of Jane's lack of physical capacity to consent.[9] We hold the record contains substantial evidence that Jane lacked the mental capacity to consent to the charged sex acts with defendant.

All three convictions in this case—attempted rape, oral copulation, and sexual penetration—were based on the theory that Jane was "incapable, because of a mental disorder or developmental or physical disability, of giving legal consent" (§§ 261, subd. (a)(1), 288a, subd. (g), 289, subd. (b); see § 664). The jury was instructed that an element of each charged offense was Jane's incapacity to consent.[10] Defendant argues that "although the prosecution's evidence establishes a disability, no evidence whatsoever was introduced that Jane was incapable of giving consent—'positive cooperation in an act or attitude pursuant to an exercise of free will' (§ 261.6)—a requisite element of the crimes of which defendant was convicted."

■ The existence of capacity to consent is a question of fact. (*People v. Griffin* (1897) 117 Cal. 583, 585 [49 P. 711] (*Griffin*), overruled on other grounds in *People v. Hernandez* (1964) 61 Cal.2d 529, 536 [39 Cal.Rptr. 361, 393 P.2d 673].) A lay juror is able to assess the extent of a victim's mental disability. " 'The question whether a person possesses sufficient resources— intellectual, emotional, social, psychological—to determine whether to participate in sexual contact with another is an assessment within the ken of the average juror, who likely has made the same determination at some point.'

the capacity to consent, in light of her condition as revealed at trial, had the potential of being construed as an attack on an already sympathetic victim, a strategy unlikely to curry favor with jurors.

[9] We need not address the Attorney General's contention that Jane was prevented from consenting due to her physical condition. Our determination that there is substantial evidence the victim was incapable of consenting due to her mental disabilities, as argued by the prosecution below, is a complete response to defendant's challenge to the sufficiency of the evidence. Our resolution of the substantial evidence issue should not be construed as meaning there was insufficient evidence of physical incapacity preventing consent—that is simply an issue we need not reach in this appeal.

The concurring opinion agrees, after expressing discomfort over the amount of proof presented by the district attorney, that there is substantial evidence Jane had a mental disability that prevented her from giving legal consent. Having resolved the case on that issue, our colleague's additional discussion on the issue of physical incapacity preventing legal consent is unnecessary to resolve the appellate contention. In any event, the concurring opinion does not articulate a legal definition of physical incapacity negating legal consent, and it concludes only that the evidence is "questionable," which provides no answer to defendant's contention that the evidence is insufficient.

[10] The jury received CALJIC Nos. 10.02, 10.11, and 10.32 defining the charged offenses, including the element that the alleged victim was incapable of giving legal consent "because of mental disorder or developmental or physical disability."

(*People v. Cratsley* (1995) 86 N.Y.2d 81, 87 [629 N.Y.S.2d 992, 653 N.E.2d 1162], fn. omitted.)" (*People v. Thompson* (2006) 142 Cal.App.4th 1426, 1439 [48 Cal.Rptr.3d 803] (*Thompson*).) "There is a nationwide consensus that expert testimony on this issue is not required. (*Com. v. Fuller* (2006) 66 Mass.App.Ct. 84, 89–92 [845 N.E.2d 434], app. den. 447 Mass. 1102 [848 N.E.2d 1211]; *State v. Perkins* (2004) 2004 WIApp. 213 [277 Wis.2d 243, 689 N.W.2d 684], review den. 2005 WI 1 [277 Wis.2d 153, 691 N.W.2d 354]; *Jackson v. State* (Alaska Crim.App. 1995) 890 P.2d 587, 589–592; *State v. Summers* (1993) 70 Wn.App. 424, 428–429 [ 853 P.2d 953]; *State v. Kingsley* (N.D. 1986) 383 N.W.2d 828, 830–831; *Wilkinson v. People* (1929) 86 Colo. 406, 412–413 [282 P. 257].)" (*Thompson, supra,* at p. 1437; see *People v. Lewis* (1977) 75 Cal.App.3d 513, 519 [142 Cal.Rptr. 218] [lack of capacity to consent "does not call for any particular type of clinical diagnosis"].)

█ The jury's determination of Jane's capacity to consent necessarily depended upon the jurors' subjective assessment of her demeanor, as her demeanor as a witness was highly probative of her mental condition. The demeanor of witnesses is rarely reflected in the record. (*People v. Navarette* (2003) 30 Cal.4th 458, 516 [133 Cal.Rptr.2d 89, 66 P.3d 1182].) "As a reviewing court, we confront a cold record without the trial court's benefit of observing firsthand the appearance and demeanor of the witness." (*People v. Lewis* (2001) 26 Cal.4th 334, 359 [110 Cal.Rptr.2d 272, 28 P.3d 34].) The jury implicitly found Vincent and Jane to be credible witnesses, "and we must give proper deference to such findings." (*Ibid.*)

"As explained by Judge Learned Hand, a witness's ' "demeanor"—is a part of the evidence. The words used are by no means all that we rely on in making up our minds about the truth of a question that arises in our ordinary affairs, and it is abundantly settled that a jury is as little confined to them as we are. They may, and indeed they should, take into consideration the whole nexus of sense impressions which they get from a witness. This we have again and again declared, and have rested our affirmance of findings of fact of a judge, or of a jury, on the hypothesis that this part of the evidence may have turned the scale.' (*Dyer* v. *MacDougall* (2d Cir. 1952) 201 F.2d 265, 269, fn. omitted.)" (*People v. Adams* (1993) 19 Cal.App.4th 412, 438 [23 Cal.Rptr.2d 512].)

Defendant argues "the only evidence was that Jane suffered from cerebral palsy and seizures, that she had difficulty speaking, and that she attended a school with special education." There is direct evidence of these facts, but it is an incomplete assessment of the totality of the evidence. The record contains strong circumstantial evidence that Jane's mental condition prevented her from having the ability to consent " 'at the time' " of the offenses.

(*Thompson, supra*, 142 Cal.App.4th at p. 1440, italics omitted ["The relevant statutes require proof that the victim was '*at the time* incapable . . . of giving legal consent . . . .' "]; see §§ 261, subd. (a)(1), 288a, subd. (g), 289, subd. (b).)

One of the strongest circumstances indicating that Jane lacked the mental capacity to consent is that she did not respond to defendant's questions asking if she liked what they were doing during the sexual assault. The jury could rationally conclude that a 15-year-old girl who had the ability to appreciate what was taking place would express some reaction to a surprise sexual assault from her grandfather in a small trailer, with her brother nearby, in the early hours of the morning. Jane's lack of response certainly suggests that she did not have the capacity to understand the consequences of defendant's acts or the ability to voluntarily consent to them. From her failure to react, the jury could infer she did not simply have difficulty speaking, but that her mental capabilities, in the circumstances of the offenses, prevented her from being capable of giving consent.[11]

A further indication of Jane's lack of capacity to consent is found in her childlike description at trial of the sexual assault. The best she could do to explain what happened was to place shaky marks on simple diagrams to indicate where and how she was touched by defendant, and hold up 10 fingers when asked about how she was touched by defendant. The impression left by her testimony was that she lacked the understanding required of one capable of giving consent and defendant knowingly took advantage of that disability. The jury could reasonably infer that an inability to articulate what happened demonstrated that Jane was not capable of appreciating what took place or freely and voluntarily participating in the acts. (*State v. Orftega-Martinez* (1994) 124 Wn.2d 702, 714 [881 P.2d 231] [in assessing whether a victim was capable of understanding the nature or consequences of sexual intercourse at the time of an incident, "the jury may evaluate, in addition to that person's testimony regarding his or her understanding, other relevant evidence such as the victim's demeanor, behavior, and clarity on the stand"].)

Jane's difficulty in answering questions at trial further supports the inference that she lacked the mental capacity to consent to defendant's conduct. The bulk of her brief testimony consisted of one-word answers in response to leading questions. She did not answer some questions and made unintelligible

---

[11] A sexual assault victim is not required to react to a defendant's unexpected attack and may fail to do so out of fear. (See *People v. Inquez* (1994) 7 Cal.4th 847, 858 [30 Cal.Rptr.2d 258, 872 P.2d 1183] [sufficient evidence of rape by fear when victim, frozen by fear, did not react to unexpected attack].) The inferences to be drawn from a victim's reaction or lack of reaction to a sexual assault vary from case to case. Here, the jury could have inferred Jane's failure to react indicated she did not appreciate the consequences of what was taking place, which supports a finding that Jane lacked the mental capacity to consent.

responses to others. Jane at times relied on gestures to answer questions. A reasonable jury could infer from her difficulty in processing what was asked of her at trial and formulating responses to the questions that she lacked the mental capacity to consent to the acts committed by defendant.

We add to these circumstances the direct evidence supporting Jane's incapacity to consent. The direct evidence established she was a 15-year-old cerebral palsy victim[12] who had trouble walking and talking. As described by her brother, the disease caused her brain to prevent her tongue from working properly. Jane attended special education and needed assistance at night due to her seizures and proclivity for getting up. Her condition caused the investigating officer to have her interviewed at the Children's Advocacy Center instead of being interviewed by the detective or prosecutor.

Defendant argues there was evidence Jane could communicate with her brother and was a high school sophomore, indicating she had the mental capacity to consent. This is no more than a request that we reweigh the evidence, which we will not do. As required, we view the evidence in the light most favorable to the judgment, drawing all inferences in support of the verdicts. Based on our summary of the evidence, the jury could infer that Jane was "prevented from legally consenting" because she was "unable to understand the act, its nature, and possible consequences." (Judicial Council of Cal. Crim. Jury Instns. (2009–2010) CALCRIM Nos. 1004, 1020, 1049.) Although our conclusion does not require additional support, we point out that this result is consistent with the observations of the parties at trial regarding Jane's mental capacity.

Numerous references to Jane's substantial disabilities were made at trial by the trial court, the prosecutor, and defense counsel. While these observations are not evidence in the sense that they were presented to the jury as proof of facts in dispute, they serve as an indication of what a juror could reasonably infer regarding Jane's capacity to consent based upon her demeanor as she testified. If the conclusions of the trial court and counsel were reasonably drawn from the evidence, the jurors could rationally reach the same conclusions based on their observations of very same conduct.

Prior to trial, the trial court commented that "Jane cannot possibly give consent." At a competency hearing before trial, the court noted Jane's inability to communicate verbally and her use of gestures and body movements. The court stated the jurors would be able to see how she responded to questions, but the record itself would be "fairly sketchy." To accommodate

---

[12] We emphasize that we do not hold that Jane's cerebral palsy equates with incapacity to consent. There is no evidence in the record to support such a conclusion. To be clear, we hold that the totality of evidence regarding Jane's mental condition supports the rational conclusion that at the time of the offenses she was prevented from consenting.

Jane's disabilities, the court intended to allow leading questions and would try to describe her actions so there would be some indication in the record as to what the jury was observing. At sentencing, the court described Jane as "one of the most vulnerable victims I have seen in a long time." (See *State v. Soura* (1990) 118 Idaho 232, 238 [796 P.2d 109] [trial court's description of victim's demeanor was "[t]he most striking evidence in support of the trial court's determination that there was substantial evidence to support the jury's finding that the woman could not legally consent to sexual intercourse"].)

Defense counsel's observations on the record were also consistent with Jane's lack of capacity to consent. After the pretrial competency hearing, defense counsel noted the court reporter's struggle to understand Jane's testimony. After trial, defense counsel complained of his inability to effectively cross-examine Jane, describing her answers as mostly grunts of "yes" or "no." At no point during trial did defense counsel question the notion that Jane lacked the capacity to consent.

The prosecutor's argument to the jury reviewed Jane's condition and the manner in which she testified, as reflecting her lack of capacity to consent. He pointed out that Jane had cerebral palsy and attended special education. The prosecutor emphasized that the jurors had seen her struggle to communicate on the witness stand, and that she used hand movements to try to communicate. The prosecutor told the jury Jane "clearly did not have the capacity to consent, because she can't understand the consequences of what was taking place."

The trial court and trial counsel made these assessments based on their individual conclusions as to Jane's demeanor as it reflected on her mental capacity to consent. The instructions given in this case directed the jury to engage in the same reasoning process by considering Jane's demeanor in assessing her capacity to consent. The jury was instructed to "consider anything that has a tendency reasonably to prove or disprove the truthfulness of the witness" including the "ability of the witness to . . . communicate any matter about which the witness has testified" and the "demeanor and manner of the witness while testifying." (CALJIC No. 2.20; see Evid. Code, § 780, subds. (a), (c).) The jury was also instructed that in "evaluating the testimony of a person with a developmental disability, or cognitive, mental, or communication impairment, you should consider all of the factors surrounding the person's testimony, including his or her level of cognitive development." (CALJIC No. 2.20.2.) The jurors, the trial court, and both counsel reached the same conclusion in this case—Jane lacked the mental capacity to give consent. Substantial evidence supports that determination.

## C. *Attempted Rape and Sexual Penetration*

Defendant separately argues there is insufficient evidence to support the convictions of attempted rape and sexual penetration. As to the attempted rape conviction, defendant contends there is no evidence he removed his boxer shorts or intended to insert his penis in Jane's vagina. The sexual penetration evidence is insufficient, according to defendant, because there is no evidence he did anything other than rub Jane's pubic area. Both arguments lack merit.

■ The crime of attempted rape has two elements—a specific intent to rape and a direct but ineffectual act done toward its commission. (*People v. Scott* (2011) 52 Cal.4th 452, 488 [129 Cal.Rptr.3d 91, 257 P.3d 703] (*Scott*); *People v. Guerra* (2006) 37 Cal.4th 1067, 1129–1130 [40 Cal.Rptr.3d 118, 129 P.3d 321].) The necessary specific intent may be inferred from the circumstances of the charged offense. (*Scott, supra,* 52 Cal.4th 452, 488; *Guerra, supra,* 37 Cal.4th 1067, 1129–1130.) Evidence that defendant got into bed with Jane while wearing boxer shorts, his acts of oral copulation and digital penetration, the up and down movements Vincent observed under the blankets as defendant was on top of Jane, defendant's questions to Jane asking if she liked what he was doing, and his erection all support a strong inference of an intent to rape and a direct but ineffectual act toward that end. The prosecution was not required to prove that defendant actually attempted to penetrate Jane with his penis to prove attempted rape. (*Scott, supra,* at p. 488 [" 'An actual element of the offense, however, need not be proven. . . .' "].) Defendant's factual claim at trial of impotence does not bar his conviction. (*People v. Hillery* (1974) 10 Cal.3d 897, 901, fn. 3 [112 Cal.Rptr.524, 519 P.2d 572].)

■ Defendant's claim of insufficient evidence of sexual penetration in violation of section 289 fares no better. The testimony of one witness is sufficient to prove any fact. (Evid. Code, § 411.) Vincent testified he was certain defendant's fingers were touching Jane's private parts as his hand was "moving up and down, and she moaning." Jane held up 10 fingers to describe how defendant had touched her. The jury could infer from these facts that defendant penetrated Jane with his fingers.

## II. *Failure to Instruct on the Definition of Legal Consent*

The trial court instructed that in order to convict defendant the jury had to find Jane was "incapable, because of a mental disorder or developmental or physical disability, of giving legal consent, and this incapacity is known or reasonably should be known to the person committing the act . . . ." (CALJIC Nos. 10.02 (attempted rape), 10.11 (oral copulation), 10.32 (sexual penetration).) The CALJIC instructions do not define "legal consent." (See *Griffin, supra,* 117 Cal. at p. 585 ["It need but be said that legal consent presupposes

an intelligence capable of understanding the act, its nature, and possible consequences."].) Defendant argues the CALJIC instructions are deficient,[13] and the trial court was required under the due process provisions of the state and federal Constitutions to define "legal consent," even in the absence of a defense request. The Attorney General, citing general language in *People v. Smithey* (1999) 20 Cal.4th 936, 980 [86 Cal.Rptr.2d 243, 978 P.2d 1171] (*Smithey*), agrees the court was obligated to provide further definition of "legal consent" without a request from defendant, but argues the error is harmless.

■ We hold that because Jane's mental capacity to give "legal consent" was not a contested issue and no issue of actual consent was presented, the trial court had no obligation to provide further definition of "legal consent." We further hold that the plain meaning of incapacity to give "legal consent" because of a mental disability does not have a technical definition requiring further instruction in the absence of a defense request or jury inquiry as to the meaning of the phrase. Finally, any error in failing to provide further instruction in this case was nonprejudicial under state and federal constitutional standards of review.

A. *Discussion of Jury Instructions in the Trial Court*

After the completion of testimony, the trial court and counsel discussed a package of jury instructions submitted by the prosecutor, including CALJIC No. 1.23[14] ("Consent"—Defined). The court asked, "How does consent fit into our particular package?" The prosecutor replied that he did not need the instruction but had included it in case the jury needed clarification, even though consent was not an element of the charges.

Later, the trial court asked both counsel if they "had a chance to think about consent?" Defense counsel stated, "I don't think it applies." The prosecutor then said, "That's fine." The court agreed, stating, "All right. I don't think it does, either. If you get a brilliant mind flash overnight, let us know. It's just as easy to put it back in." The next day, the court engaged in

---

[13] Defendant contrasts the CALJIC instructions with CALCRIM Nos. 1004, 1019, and 1049 (defining the crimes at issue here), which defendant points out properly define the inability to give legal consent as a condition in which the victim is "unable to understand the act, its nature, and possible consequences"). The completeness of the CALCRIM instructions on this subject does not establish that the CALJIC instructions were erroneous or prejudicial under the circumstances of this case.

[14] Consistent with the language of section 261.6, which is to be given in cases in which consent is in issue, CALJIC No. 1.23 provides as follows: "To consent to an act or transaction, a person (1) must act freely and voluntarily and not under the influence of threats, force or duress; (2) must have knowledge of the true nature of the act or transaction involved; and (3) must possess the mental capacity to make an intelligent choice whether or not to do something proposed by another person. [¶] [Merely being passive does not amount to consent.] Consent requires a free will and positive cooperation in an act or attitude."

further discussion of jury instructions. At no time did the defense request an instruction defining "legal consent." As noted in our earlier discussion of the sufficiency of the evidence, the defense did not assert at trial that Jane was capable of giving legal consent.

### B. *The Obligation to Further Define "Legal Consent"*

The premise of defendant's argument is the use of the word "legal" before the word "consent" suggested to the jury that the phrase meant something other than the ordinary meaning of consent. We have no reason to believe the jury would have attached any significance to the qualifier of "legal" to the word "consent." The plain language of the instruction simply asked the jury to determine if Jane was incapable of giving consent *in the manner required by law* because of a mental disability. As we explain, the essential elements of legal consent are found in the statutory definition of consent, and as a consequence, no further instruction was required.

█ Under *Griffin*, "legal consent" consists of the intelligence to understand (1) the act, (2) its nature, and (3) its probable consequences. The elements of actual consent in section 261.6 overlap with the *Griffin* definition of "legal consent"—actual consent requires that the victim act with positive cooperation and knowledge of the nature of the act involved. Both definitions therefore include cognitive understanding of the nature of the acts involved. The instructions properly focused the jury's attention on this element of the charged offense—that Jane was *incapable* of giving "legal consent." No further definition of "legal consent" was required under the circumstances of this case.

Our Supreme Court has held that the common understanding of consent is more favorable to a defendant than the legal definition. (*People v. Martinez* (2010) 47 Cal.4th 911, 955 [105 Cal.Rptr.3d 131, 224 P.3d 877].) Given the reasoning of *Martinez*, and the common elements of "legal consent" and actual consent, the trial court had no sua sponte duty to provide additional instruction in a case in which the defense did not contest Jane's incapacity to consent, the jurors expressed no confusion about the meaning of "legal consent," and they did not request further instruction on the meaning of the phrase. (*Ibid.* ["Nothing indicates that the jury was confused or required a definition of 'consent.' "].) Instruction in the statutory language was sufficient.

█ "As we explained in *People v. Poggi* (1988) 45 Cal.3d 306 [246 Cal.Rptr. 886, 753 P.2d 1082], '[t]he language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification. If the jury would have no difficulty in understanding the statute without guidance, the [trial] court need do no more than instruct in statutory language.' (*Id.* at p. 327; see also *People v. Rogers* (1971) 5 Cal.3d 129, 138 [95 Cal.Rptr. 601,

486 P.2d 129]; *People* v. *Page* (1980) 104 Cal.App.3d 569, 577 [163 Cal.Rptr. 839].)" (*People v. Estrada* (1995) 11 Cal.4th 568, 574 [46 Cal.Rptr.2d 586, 904 P.2d 1197] (*Estrada*); see *Smithey, supra*, 20 Cal.4th at pp. 980–981.)

In *Estrada*, review was granted "to resolve a conflict in the Courts of Appeal over whether a trial court has a sua sponte duty to define the phrase 'reckless indifference to human life' when instructing a jury regarding a felony-murder special-circumstance allegation against a defendant who is not the actual killer." (*Estrada, supra*, 11 Cal.4th at p. 572.) *Estrada* held that " 'reckless indifference to human life' is commonly understood to mean that the defendant was subjectively aware that his or her participation in the felony involved a grave risk of death. The common meaning of the term 'indifference,' referring to 'the state of being indifferent,' is that which is 'regarded as being of no significant importance or value.' (Webster's New Internat. Dict. (3d ed. 1981) p. 1151, col. 1.) To *regard* something, even to regard it as worthless, is to be aware of it. (See *id.* at p. 1911, col. 1 ['regard' is synonymous with 'consider, evaluate, judge'].)" (*Estrada, supra*, 11 Cal.4th at p. 577.)

*Smithey, supra*, 20 Cal.4th 936, cited by respondent, involved an argument that further definition of the phrase "maturely and meaningfully reflected" was required in connection with instructions on deliberate and premeditated murder. "The words in the phrase 'maturely and meaningfully reflected' are commonly understood terms that convey the same meaning in both section 189 and our decision in *People* v. *Wolff* [(1964)] 61 Cal.2d [795,] 821 [40 Cal.Rptr. 271, 394 P.2d 959]. Therefore, the trial court had no obligation to provide further clarification of the statutory language. (*People* v. *Estrada, supra*, 11 Cal.4th at p. 581.)" (*Smithey, supra*, 20 Cal.4th at pp. 980–981.)

*People v. Poggi, supra*, 45 Cal.3d at page 327 (*Poggi*) reaches a similar conclusion. The defendant in *Poggi* argued that the instruction, " 'the murder was committed *while the defendant was engaged in* the commission of a rape, robbery, burglary, or any or all of these offenses' " required further explanation of the meaning of the italicized clause. (*Ibid.*) Our Supreme Court disagreed, holding the instruction was taken verbatim from the statutory language, no request for amplification was made by the defendant, and the jury did not need additional guidance in understanding the instruction. (*Ibid.*)

The phrase "legal consent" certainly has no more technical a meaning than the phrases "reckless indifference to human life" in *Estrada*, "maturely and meaningfully reflected" in *Smithey*, and " 'the murder was committed *while the defendant was engaged in* the commission . . .' " of a crime in *Poggi*. (See also *People v. Rodriguez* (2002) 28 Cal.4th 543, 546–550 [122 Cal.Rptr.2d 348, 49 P.3d 1085] [further definition of "recurring access" in

§ 288.5 not required]; *People v. Richie* (1994) 28 Cal.App.4th 1347, 1360–1362 [34 Cal.Rptr.2d 200] ["willful" and "wanton" as used in Veh. Code, § 2800.2 need not be further defined by the court].) There is no reason to believe the jury would have understood "legal consent" to have meant anything other than the law requires the capacity to understand what is happening and the nature and consequences of the act.

Defendant relies on *People v. Giardino* (2000) 82 Cal.App.4th 454 [98 Cal.Rptr.2d 315] for the proposition that the trial court was obligated to provide a definition of "legal consent." In *Giardino*, the jury in a prosecution for rape of a person prevented from resisting by an intoxicating substance requested a definition of the word "resistance." *Giardino* held that the failure to further define the term, beyond telling the jury to use its common sense, was an inadequate response requiring reversal. *Giardino* is clearly distinguishable because it involved the failure to provide a response to the jury's request for further instruction during deliberations. Here, not only was there no request for a definition of "legal consent" by the jury during deliberations, the issue of Jane's capacity to give "legal consent" was not disputed by defendant at trial. *Giardino* provides no support for defendant's position.

### C. *Harmless Error*

Assuming further definition of "legal consent" was required sua sponte, the error was harmless under federal and state law standards of review. This case never involved a dispute over Jane's capacity to consent. This case was about whether the charged acts occurred. Further instruction on Jane's capacity to consent would have focused attention on Jane's condition, with no possible benefit to defendant. Given the state of the evidence, and the issues in dispute at trial, there was no reasonable possibility or probability of a result more favorable to defendant had the jury been further instructed on the meaning of "legal consent." (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]; Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

### III. *Exclusion of Evidence*

Defendant argues the trial court violated his state and federal constitutional rights[15] to cross-examine witnesses when it excluded evidence of a prior false complaint of sexual abuse by Jane pursuant to Evidence Code section 352.

---

[15] The Attorney General argues defendant forfeited his constitutional claims by failing to specifically assert them in the trial court. While it is true defense counsel did not specifically mention the Sixth Amendment in argument, the defense position was clearly stated that he had the right to question witnesses about the alleged prior false report of sexual abuse. We deem that sufficient to preserve the constitutional issue.

The evidence was relevant and admissible, according to defendant, to challenge Jane's credibility. Defendant contends the proposed impeaching evidence was not weak and could have been established by testimony from Jane's father that the allegations were false. Proof of the falsity of the prior complaint would not have consumed an undue amount of time, nor would the issue have confused the jury.

## A. Background

The prosecution filed a pretrial motion to exclude evidence of Jane's prior sexual history, specifically referring to evidence that she was the subject of an earlier sexual abuse investigation. According to the motion, "Information obtained in a report generated by Riverside County DPSS-CPS indicates that Jane is listed as a victim and Jane's father is listed as a suspect. DPSS concludes in the report that 'Substantial Risk of Sexual Abuse is Unfounded.' The date of the alleged incident is March, 2006." The prosecution asked for exclusion of evidence of the incident under Evidence Code section 352. According to the prosecutor, it was Jane's mother who made the complaint to a social worker in Missouri who contacted Riverside County authorities. The prosecutor told the trial court, "There is no indication in the report that Jane, herself, made any allegations or statements against her father." The prosecutor argued if questioning on this subject were permitted, it would confuse the jury and lead to an undue consumption of time.

Defense counsel argued that the context of the prior false complaint was similar to that in this case. The prior complaint was made after Jane's parents divorced. Jane's father had custody of her and Vincent. Before the false complaint was resolved, the mother took the children and moved to Denver. In defendant's case, Vincent was having trouble in school and there was talk of him living with his father in the grandparent's home. Shortly after that was discussed, Jane's sexual assault report against defendant was made. Defense counsel's interpretation of the two incidents was that both were motivated by the mother, who had a financial interest in maintaining custody of the two children. Counsel said he had "a copy of that report if the court wants to see and review it," and he insisted that Jane had made the complaint against her father. The report of the prior complaint of sexual abuse is not in the appellate record.

The prosecutor disputed defense counsel's interpretation of the report, again stating the statements in the report came from Jane's mother to a social worker in Missouri, who then contacted Riverside authorities to investigate. The prosecutor also argued the social worker's conclusion that the claim was unfounded was merely the opinion of the author of the report, but it did not mean there was no sexual abuse. The prosecutor disputed that there was any "nexus" between the prior incident and this case.

Defense counsel said he wanted Jane's mother to testify about the prior report of sexual abuse, asserting the mother would testify that her daughter told her about the abuse. If the mother denied that, the social worker would be called to testify about the mother's statement containing Jane's statement of abuse. The father would testify the sexual abuse did not happen.

The trial court ruled the evidence inadmissible, questioning its relevance, the clarity of the evidence, and the number of layers of statements that would be required to fully develop the point. The next day, defense counsel raised the issue again by calling the opinion in *People v. Tidwell* (2008) 163 Cal.App.4th 1447 [78 Cal.Rptr.3d 474] (*Tidwell*) to the attention of the court, to support admission of a prior false complaint by Jane. After argument from the parties, the court discussed *Tidwell* in detail, finding that it did not compel a different ruling.

The trial court first distinguished *Tidwell* on the basis that the defense in *Tidwell* was that the victim consented to the sex acts, but "[i]n our particular case, there is no consent issue. Jane cannot possibly give consent." In addition, the court noted there was a corroborative witness to Jane—Vincent—who would testify to what he observed. In the court's view, the entire line of questioning would consume an undue amount of time and mislead the jury as to the principal points of the case.

B. *Analysis*

 Evidence of a prior false report of molestation or rape is relevant to the credibility of the victim. (*Tidwell, supra*, 163 Cal.App.4th at p. 1457, citing *People v. Franklin* (1994) 25 Cal.App.4th 328, 335 [30 Cal.Rptr.2d 376], *People v. Adams* (1988) 198 Cal.App.3d 10, 18 [243 Cal.Rptr. 580].) Prior rape complaints do not reflect on credibility unless proven to be false. (*People v. Bittaker* (1989) 48 Cal.3d 1046, 1097 [259 Cal.Rptr. 630, 774 P.2d 659] (*Bittaker*); *Tidwell, supra*, at p. 1457.) The trial court has discretion under Evidence Code section 352[16] to exclude evidence of prior reports of sexual assault if proof of the falsity of the prior complaint "would consume considerable time, and divert the attention of the jury from the case at hand." (*Bittaker, supra*, at p. 1097.)

In *Bittaker*, "[d]efense counsel sought to impeach [a victim] by evidence that she had made false charges of sexual molestation against two other men. The trial court upheld an objection under Evidence Code section 352. Its

---

[16] Evidence Code section 352 provides as follows: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

ruling is not an abuse of discretion. The value of the evidence as impeachment depends upon proof that the prior charges were false. This would in effect force the parties to present evidence concerning two long-past sexual incidents which never reached the point of formal charges." (*Bittaker, supra,* 48 Cal.3d at p. 1097.)

*Tidwell* involved charges of sexual assault of a 21-year-old deaf woman with a learning disability. (*Tidwell, supra,* 163 Cal.App.4th at p. 1449.) The defense was consent. (*Id.* at p. 1450.) The defense sought to impeach the victim with evidence of prior false complaints of rape. (*Id.* at p. 1452.) Although "the evidence was relevant and admissible pursuant to Evidence Code section 1103, the trial court did not abuse its discretion by excluding the evidence because the evidence was weak on the issue of [the victim's] credibility and would require an undue consumption of time." (*Id.* at pp. 1456–1457.)

"Although there was some evidence that [the victim] made inconsistent statements, there was no conclusive evidence that her prior rape complaints were false. The defense was unable to obtain evidence from the men that [the victim] accused, and inferences could be drawn either way from the circumstances of the prior incidents and [the victim's] statements concerning the incidents. In addition to the weaknesses in the evidence concerning falsity of the rape complaints, admitting the evidence would have resulted in an undue consumption of time as the defense attempted to bolster its view and the prosecution introduced evidence that [one of the men involved in a prior complaint] had raped another female student. We therefore cannot say that the trial court abused its discretion in excluding the evidence based on the weak nature of the evidence of falsity of the complaints and the confusion of the jury and consumption of time it would have engendered for the parties to embark on the task of litigating the truthfulness of [the victim's] prior complaints." (*Tidwell, supra,* 163 Cal.App.4th at p. 1458.)

Application of the Evidence Code section 352 factors in this case demonstrates the trial court did not abuse its discretion in excluding the evidence. The probative value of the proffered evidence was questionable, as the prosecutor insisted the report from Riverside County contained no statements from Jane, and although defense counsel argued otherwise, he never quoted a statement from her from the report (which, as noted earlier, is not in the appellate record). Second, the prior complaint, if made by Jane, would only be relevant if false, and no clear showing of falsity was made. The conclusion that the claim was unfounded was an opinion of a social worker, and the admissibility of that conclusion is doubtful. Not only was the evidence showing a prior false complaint uncertain, but delving into the issue had the potential for confusing the jury and consuming an undue amount of time.

According to defense counsel, the current and prior complaints had a connection to the divorce of Jane's parents and issues of child custody, matters far afield from the charges in this case. The trial court also considered the existence of Vincent as an independent witness to the charged offenses, which distinguished the case from the typical scenario of a one-on-one sexual assault, in which victim credibility is often determinative. Because the trial court's ruling was not an abuse of discretion under Evidence Code section 352, defendant's constitutional claim also fails. (*People v. Panah* (2005) 35 Cal.4th 395, 484, fn. 32 [25 Cal.Rptr.3d 672, 107 P.3d 790]; *People v. Jenkins* (2000) 22 Cal.4th 900, 1014–1015 [95 Cal.Rptr.2d 377, 997 P.2d 1044].)

IV. *Violation of Equal Protection of the Law by Ordering Registration Under Section 290*

For the first time on appeal, defendant argues the order that he register for life as a sex offender under section 290 for sexual offenses against a person incapable of giving legal consent violates equal protection of law under the reasoning of *People v. Hofsheier* (2006) 37 Cal.4th 1185 [39 Cal.Rptr.3d 821, 129 P.3d 29] (*Hofsheier*). According to defendant, he is similarly situated to defendants convicted of consensual sex offenses with minors who, due to their ages, are incapable of giving consent.

■■■ Every person convicted of attempted rape in violation of sections 664 and 261, oral copulation in violation of section 288a, and sexual penetration under section 289 is subject to mandatory lifetime registration as a sex offender. (§ 290, subds. (b)–(c).) Thus defendant fell within the class of offenders required to register as a sex offender for life.

*Hofsheier* involved a 22-year-old male defendant who pled guilty to oral copulation with a 16-year-old girl in violation of section 288a, subdivision (b)(1) and was ordered to register for life as a sex offender under section 290. The defendant argued lifetime registration violated his right to equal protection of law "because a person convicted of unlawful sexual intercourse with a minor (§ 261.5) under the same circumstances would not be subject to mandatory registration." (*Hofsheier, supra*, 37 Cal.4th at p. 1193.) The Supreme Court agreed. "We now hold, in accord with the decision of the Court of Appeal in this case, that to subject defendant to the mandatory registration requirement of section 290, subdivision (a)(1)(A) would deny defendant the equal protection of the laws. We direct the Court of Appeal to remand the case to the trial court, however, to exercise its discretion to determine whether defendant should be required to register as a sex offender under section 290, subdivision (a)(2)(E)." (*Id.* at p. 1193.)

The reasoning of *Hofsheier* has been applied in various situations. (E.g., *People v. Thompson* (2009) 177 Cal.App.4th 1424, 1431 [100 Cal.Rptr.3d 57]

[mandatory lifetime registration for sodomy with a 17 year old violates equal protection because unlawful sexual intercourse with the same victim provides for discretionary registration]; *People v. Ranscht* (2009) 173 Cal.App.4th 1369, 1375 [93 Cal.Rptr.3d 800] [mandatory lifetime registration for sexual penetration of a 13-year-old girl violates equal protection as compared to discretionary registration for conviction of unlawful sexual intercourse of a victim of the same age]; *People v. Luansing* (2009) 176 Cal.App.4th 676, 678 [97 Cal.Rptr.3d 836] [lifetime registration violates equal protection as to defendant convicted of oral copulation of a person age 16 in violation of § 288a, subd. (b)(2)]; *People v. Hernandez* (2008) 166 Cal.App.4th 641, 651 [83 Cal.Rptr.3d 29] [same as to victim age 14]; *People v. Garcia* (2008) 161 Cal.App.4th 475, 481–482 [74 Cal.Rptr.3d 681] [denial of equal protection to impose mandatory lifetime registration on defendant convicted of oral copulation of victim age 14 in violation of § 288a, subd. (b)(2)].)

Other cases have distinguished *Hofsheier* and found no equal protection violation when lifetime registration is required by section 290 for offenses committed upon minors. (See, e.g., *People v. Kennedy* (2009) 180 Cal.App.4th 403, 409–410 [103 Cal.Rptr.3d 161] [attempted exhibiting harmful matter to a minor in violation of §§ 664, 288.2, subd. (b)]; *People v. Cavallaro* (2009) 178 Cal.App.4th 103, 115 [100 Cal.Rptr.3d 139] [lewd and lascivious acts on a victim age 14 or 15 and the defendant 10 or more years older, in violation of § 288, subd. (c)(1)]; *People v. Manchel* (2008) 163 Cal.App.4th 1108, 1115 [78 Cal.Rptr.3d 194] [oral copulation of a victim age 15 and the defendant over the age of 21 in violation of § 288a, subd. (b)(2)]; *People v. Anderson* (2008) 168 Cal.App.4th 135 [85 Cal.Rptr.3d 262] [lewd act on a child age 14 or 15 by a person at least 10 years older in violation of § 288, subd. (c)(1)].)[17]

Defendant's equal protection claim does not survive the first level of equal protection analysis. " 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' (*In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549]; see *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253 [127 Cal.Rptr.2d 177, 57 P.3d 654].)" (*Hofsheier, supra,* 37 Cal.4th at p. 1199.)
In *Hofsheier,* the court held that "section 288a[, subdivision] (b)(1) and section 261.5 both concern sexual conduct with minors. The only difference between the two offenses is the nature of the sexual act. Thus, persons convicted of oral copulation with minors and persons convicted of sexual

---

[17] *People v. Luansing, supra,* 176 Cal.App.4th 676, *People v. Garcia, supra,* 161 Cal.App.4th 475, *People v. Hernandez, supra,* 166 Cal.App.4th 641, and *People v. Manchel, supra,* 163 Cal.App.4th 1108 were each disapproved on other grounds in *People v. Picklesimer* (2010) 48 Cal.4th 330, 338, footnote 4 [106 Cal.Rptr.3d 239, 226 P.3d 348].

intercourse with minors 'are sufficiently similar to merit application of some level of scrutiny to determine whether distinctions between the two groups justify the unequal treatment.' (*People v. Nguyen* [(1997)] 54 Cal.App.4th [705,] 715 [63 Cal.Rptr.2d 173].)" (*Hofsheier, supra*, at p. 1200.)

 We reject defendant's suggestion that his conduct with Jane was consensual because there is "no evidence that the victim did not willingly engage in activities with appellant." Attempted rape, oral copulation, and sexual penetration of a person incapable of giving legal consent due to mental, developmental, or physical disability, regardless of the age of the victim, are violent, nonconsensual crimes, which bear no relationship to the allegations in *Hofsheier*. There is no evidence that the "activities" in this case were consensual.

Defendant argues the inability to consent under the law is the same for minors who engage in consensual sex acts and victims who lack the capacity to consent. Defendant thus attempts to demonstrate that he is similarly situated with a person who engages in consensual sexual conduct with a minor. Defendant oversimplifies the issue.

 "[W]hen the Legislature amended the rape statute in 1970 to exclude the act of sexual intercourse with a minor, and then created the separate crime of unlawful sexual intercourse with a minor (§ 261.5), it 'implicitly acknowledged that, in some cases at least, a minor may be capable of giving legal consent to sexual relations.' (*People v. Tobias* (2001) 25 Cal.4th 327, 333 [106 Cal.Rptr.2d 80, 21 P.3d 758].) The existence of such consent, of course, is the distinction between the crimes. Nonconsensual sexual intercourse with a minor still constitutes rape, and carries a higher penalty." (*People v. Hillhouse* (2003) 109 Cal.App.4th 1612, 1620 [1 Cal.Rptr.3d 261], fn. omitted (*Hillhouse*).)

While some offenses, such as unlawful sexual intercourse, prohibit consensual sexual conduct with minors, crimes committed upon victims incapable of giving consent "do turn upon the issue of consent, and specifically 'legal' consent." (*Hillhouse, supra*, 109 Cal.App.4th at p. 1620.) Minors are treated differently from adults because they have not reached the level of maturity presumed of adults, they tend to be more vulnerable, and less likely to think in long-range terms. (*Id.* at p. 1621.) "It is for those reasons that our laws governing sexual contact with minors make it irrelevant, as a general rule, whether the minor consented." (*Ibid.*)

As a result, crimes against those legally incapable of consenting "contain different elements . . . than the provisions governing sexual contact with minors. If the prosecution proves only that the sexual contact occurred with a

victim who was under a certain age, but not that he or she was suffering from an impairment that precluded legal consent, the crime falls within the latter statutory definition. However, if the evidence demonstrates the victim was unable to give legal consent due to a disability, and the defendant knew or should have known that, then the crime falls within the statutes protecting mentally disordered or disabled victims, without regard to their age." (*Hillhouse, supra*, 109 Cal.App.4th at p. 1621.)

*Hillhouse* makes clear that defendant, who committed acts upon a victim incapable of giving consent due to a mental disability, is not similarly situated to a defendant who engages in consensual sexual conduct with a minor. Crimes against those incapable of defending themselves are among the most serious under the law. The requirement that defendant register for life as a sex offender under section 290 does not violate equal protection.

### DISPOSITION

The judgment is affirmed.·

Turner, P. J., concurred.

**MOSK, J., Concurring.**—I concur.

Defendant's contention on appeal as to the insufficiency of evidence that Jane Doe had a mental disorder preventing her from giving legal consent is arguable, although, ultimately I concur in the majority's opinion. Defendant correctly argues—as the Attorney General concedes—that the trial court erred in failing, sua sponte, to instruct the jury as to the meaning of "legal consent" in Penal Code[1] sections 261, subdivision (a)(1), 288a, subdivision (g), and 289, subdivision (b). But that error was not prejudicial.

### I. Sufficiency of the Evidence

#### A. *Relevant Legal Principles*

The charged crime of rape of an incompetent person consists of "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator . . . [¶] [w]here a person is incapable, because of a mental disorder or developmental or physical disability, of giving legal consent, and this is known or reasonably should be known to the person committing the act." (§ 261, subd. (a)(1).) The charged crime of oral copulation of an incompetent person consists of an act of oral copulation where "the victim is at the time

---

[1] All statutory references are to the Penal Code unless otherwise noted.

incapable, because of a mental disorder or developmental or physical disability, of giving legal consent, and this is known or reasonably should be known to the person committing the act . . . ." (§ 288a, subd. (g).) The charged crime of sexual penetration of an incompetent person by foreign object consists of an act of sexual penetration when "the victim is at the time incapable, because of a mental disorder or developmental or physical disability, of giving legal consent, and this is known or reasonably should be known to the person committing the act or causing the act to be committed . . . ." (§ 289, subd. (b).)

"The concept of legal consent, although not often discussed in our case law, was explained as long ago as 1897 and repeated in the same terms in 1977: '[L]egal consent presupposes an intelligence capable of understanding the act, its nature, and possible consequences.' (*People v. Griffin* (1897) 117 Cal. 583, 585 [49 P. 711], overruled on other grounds in *People v. Hernandez* (1964) 61 Cal.2d 529, 536 [39 Cal.Rptr. 361, 393 P.2d 673, 8 A.L.R.3d 1092]; *People v. Lewis* (1977) 75 Cal.App.3d 513, 519 [142 Cal.Rptr. 218].)" (*People v. Hillhouse* (2003) 109 Cal.App.4th 1612, 1620–1621 [1 Cal.Rptr.3d 261];[2] see CALCRIM No. 1004 ["Rape of a Disabled Woman"] ["A woman is prevented from legally consenting if she is unable to understand the act, its nature, and possible consequences." (italics & boldface omitted)]; CALCRIM Nos. 1019 ["Oral Copulation of a Disabled Person"], 1049 ["Sexual Penetration of a Disabled Person"] ["A person is prevented from legally consenting if he or she is unable to understand the act, its nature, and probable consequences." (italics & boldface omitted)].)[3]

## B. *Evidence of Jane's Incapacity*

Prior to testifying before the jury, Jane, who had cerebral palsy, was examined outside of the jury's presence to determine if she was competent to testify. During the brief examination, she answered most of the questions with one- and two-word answers. She answered other questions with responses that the court reporter described as, "No audible response." Of these inaudible responses, the trial court observed, "It's apparent that nonverbal expression is also taking place in addition to the verbal expressions." The trial court stated,

---

[2] Other states have evaluated the capacity to consent in varying ways. (See *State v. Mosbrucker* (2008) 2008 ND 219 [758 N.W.2d 663, 666–667]; Note, *Criminal Law and the Capacity of Mentally Retarded Persons to Consent to Sexual Activity* (1997) 83 Va. L.Rev. 799, 812–817.)

[3] The trial court instructed the jury with California Jury Instructions, Criminal (2008 ed.) (CALJIC). Unlike the Judicial Council of California, Criminal Jury Instructions (2011) (CALCRIM), the CALJIC instructions do not define "legal consent." The trial court did not instruct the jury on the meaning of legal consent. Defendant contends the trial court's failure was error. The Attorney General concedes the error, but argues that the error was harmless. I discuss this issue *post*.

"I think the record should reflect that she is gesturing, certainly with one arm, if not both arms, and her head is swinging around in response to the questions yes or no."

The trial court found Jane competent to testify, but noted, "It seems—she's going to be difficult to understand. I understand that. There's going to be a lot of body movement. There's going to be a lot of gestures. The jurors are going to be in an excellent position to be able to see what she's doing and to relate that back to the question. [¶] For the record, again, it's going to be, in my estimation, a fairly sketchy record as to exactly how it is she's expressing the various items." Based on its assessment of Jane's ability to express herself, the trial court permitted the prosecutor and defense counsel to examine Jane with leading questions during trial.

Jane's answers to questions during her trial testimony consisted largely of one-word answers and physical gestures. Although Jane testified that she suffered from seizures and thus never slept alone, she did not testify that she had cerebral palsy or provide substantive testimony about any mental disorder or physical disability that would prevent her from giving legal consent. The manner in which Jane testified would allow a reasonable juror to conclude that she had a mental disorder or physical disability that impaired her ability to speak. But the issue is whether that testimony permitted a reasonable juror to conclude that she had a mental disorder or physical disability that rendered her incapable of understanding the acts of sexual intercourse, oral copulation, or digital penetration, or the nature and possible consequences of such acts. (*People v. Griffin, supra,* 117 Cal. at p. 585; *People v. Hillhouse, supra,* 109 Cal.App.4th at pp. 1620–1621; *People v. Lewis, supra,* 75 Cal.App.3d at p. 519.)

Other than Jane, each of the witnesses who testified—Vincent, Detective Selby, defendant's wife Evelyn, and defendant—testified briefly about Jane's cerebral palsy or "condition." None of these witnesses testified that Jane's cerebral palsy or "condition" rendered her incapable of giving legal consent. None of the witnesses testified that Jane suffered from a mental disorder or a physical disability in addition to cerebral palsy. No witness testified that Jane suffered from a mental disorder or physical disability—whether cerebral palsy or some other condition—that rendered her incapable of understanding the acts of sexual intercourse, oral copulation, or digital penetration, or the nature and possible consequences of such acts. There was no expert testimony.

In his opening statement to the jury, the prosecutor stated that Jane "suffers from cerebral palsy. She has the mental capacity of a second grader." No evidence was presented, however, that Jane had the mental capacity of a second grader. Prior to the prosecutor's opening statement, the trial court

explained to the jury that an opening statement is not evidence, but an outline of what the prosecutor expected the evidence to show.

The prosecution did not present any evidence as to what cerebral palsy is, whether it affects a person's cognitive ability, and, most importantly, how it affected Jane's cognitive ability. (See *People v. Mobley* (1999) 72 Cal.App.4th 761, 768–771, 777–779 [85 Cal.Rptr.2d 474] [prosecution presented extensive evidence of the victim's functioning mental state through the testimony of family members and a psychologist who evaluated the victim], disapproved on another ground in *People v. Trujillo* (2006) 40 Cal.4th 165, 181, fn. 3 [51 Cal.Rptr.3d 718, 146 P.3d 1259].) The only evidence presented to the jury concerning the effect cerebral palsy had on Jane was Vincent's testimony that it impaired Jane's ability to speak and walk and Evelyn's testimony that it impaired Jane's fine motor skills and caused Jane to have seizures. That Jane received special education, by itself is of no significance. Special education can be given to those with physical disabilities or learning disabilities. In view of this record, the question arises as to whether there is sufficient evidence from which a reasonable juror could infer that Jane lacked the capacity to give legal consent.

The Attorney General argues that element is satisfied where, as here, there is sufficient evidence of a *physical disability* that prevents a victim from giving legal consent. The Attorney General points to evidence that Jane suffered from cerebral palsy and her ability to speak was limited; she suffered from seizures; she received special education services because of her disability; she testified by means of leading questions and physical gestures, and had difficulty putting more than two words together; and while molesting her, defendant "had to repeatedly ask her if she liked what he was doing." But, physical impairment is not the equivalent of a lack of capacity to consent.

The Attorney General's claim with respect to Jane's limited ability to speak and the manner in which Jane communicated appears to suggest that legal consent referred to in the applicable statutes concerns a victim's ability to articulate consent. The "legal consent," according to our Supreme Court, "presupposes an intelligence capable of understanding the [sexual] act, its nature, and possible consequences." (*People v. Griffin, supra*, 117 Cal. at p. 585;[4] see *People v. Hillhouse, supra*, 109 Cal.App.4th at pp. 1620–1621; *People v. Lewis, supra*, 75 Cal.App.3d at p. 519.) CALCRIM follows this definition of legal consent by providing a person is *"prevented from legally*

[4] At the time of *People v. Griffin, supra*, 117 Cal. at page 585, former section 261, subdivision (2) provided that rape includes, "Where she is incapable, through lunacy or any other unsoundness of mind, whether temporary or permanent, of giving legal consent."

*consenting* if [he or] she is unable to understand the act, its nature, and possible consequences." (CALCRIM Nos. 1004, 1019, boldface omitted; see CALCRIM No. 1049.)

Whether or not the charged offenses concern a physical disability, without regard to mental capacity, it is questionable if there is sufficient evidence of such an incapacitating physical disability here. A person can have the ability to give consent even though he or she responds to questions with one- or two-word answers and with physical gestures. The Attorney General does not explain the asserted connection between seizures and an inability to give consent. The Attorney General also fails to explain how defendant's repeated inquiries of Jane about whether she enjoyed being sexually assaulted by her grandfather concerns her ability physically to give legal consent.

Regardless of Jane's physical condition, there is sufficient evidence that Jane lacked the mental capacity to consent. The jury was not instructed specifically to consider demeanor in determining mental capacity. But, in other contexts, demeanor is an appropriate factor to consider when mental conditions are in issue. (See *People v. Rogers* (2006) 39 Cal.4th 826, 847 [48 Cal.Rptr.3d 1, 141 P.3d 135] [incompetency].) And it has been said that sufficient evidence of the mental incapacity of a sex victim "may be based on the jury's assessment of the victim's testimony and demeanor." (*Jackson v. State* (Alaska Ct.App. 1995) 890 P.2d 587, 591 [defendant's conviction for sexual intercourse with female whom defendant knew to be " 'mentally incapable' " of consent was supportable, despite absence of expert testimony as to woman's mental condition, because woman's testimony revealed her incapacity]; see *Regan v. Hoffner* (E.D.Mich. 2002) 209 F.Supp.2d 703, 711 [as to sex crime victim's mental capacity, "[t]he jury was able to make this determination on the basis of the complainant's appearance, demeanor, behavior, and testimony at trial"]; *State v. Juarez* (1993) 19 Kan.App.2d 37 [861 P.2d 1382, 1385] ["when the capacity of a mentally deficient individual to consent to a sexual act is at issue, the jury is capable of determining whether that individual is able to understand the nature and consequences of engaging in such an act. In reaching its determination, the jury should evaluate the individual's behavior in normal social intercourse as well as consider any expert testimony concerning the individual's mental deficiency."]; *State v. Hitch* (Minn.Ct.App. 1984) 356 N.W.2d 820, 821 [in connection with issue of capacity to consent to sex, "The jury observed complainant on the witness stand. They listened to her testify, and were entitled to reach their conclusions based on her obviously limited communication skills, her demeanor, and her use of childlike vocabulary."]; *Wilkinson v. People* (1929) 86 Colo. 406 [282 P. 257, 259] ["The victim was present in court and testified; the jury had the opportunity of seeing her, and were capable of judging as to her mentality, and determined that she did not have the mental capacity to give legal consent."]; see also *People v. Thompson*

(2006) 142 Cal.App.4th 1426, 1437 [48 Cal.Rptr.3d 803] [expert testimony not required to determine capacity to give legal consent].)

I recognize that it is difficult to determine the sufficiency of evidence when the issue is based almost entirely on demeanor. The problem is compounded here by the failure of defense counsel to focus on the issue of capacity, but that may have been a tactical decision. And, of course, the prosecution has, as a matter of due process, the burden to prove each element of the offense charged. (*People v. Kobrin* (1995) 11 Cal.4th 416, 419 [45 Cal.Rptr.2d 895, 903 P.2d 1027].) Moreover, I am concerned that a mere physical impairment might erroneously be equated with a lack of mental capacity.[5] Nevertheless, based on the testimony and demeanor of Jane and the evidence about her, and despite my qualms about the sufficiency of the evidence as to an element of the crime charged,[6] I concur as to the determination of the sufficiency of the evidence contention.

## II. Instructional Error

### A. *Sua Sponte Duty to Instruct*

I agree with the Attorney General that the trial court erred by failing, sua sponte, to define the phrase "legal consent." " ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." [Citation.]' " (*People v. Middleton* (1997) 52 Cal.App.4th 19, 30 [60 Cal.Rptr.2d 366], disapproved on other grounds in *People v. Gonzalez* (2003) 31 Cal.4th 745, 752, fn. 3 [3 Cal.Rptr.3d 676, 74 P.3d 771].) "That obligation comes into play when a statutory term 'does not have a plain, unambiguous meaning,' has a 'particular and restricted meaning' [citation], or has a technical meaning peculiar to the law or an area of law [citation]." (*People v. Roberge* (2003) 29 Cal.4th 979, 988 [129 Cal.Rptr.2d 861, 62 P.3d 97].) "A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning." (*People v. Estrada* (1995) 11 Cal.4th 568, 574 [46 Cal.Rptr.2d 586, 904 P.2d 1197]; accord, *People v. Roberge, supra*, 29 Cal.4th at p. 988.)

"The language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient

---

[5] See Christy Brown, My Left Foot (1954 Secker & Warburg; 1998 Harper Collins) (autobiography of Irish author, painter, and poet, which was made into an Academy Award-winning film).

[6] I fully recognize the abhorrence of the acts found by the jury.

when the defendant fails to request amplification." (*People v. Poggi* (1988) 45 Cal.3d 306, 327 [246 Cal.Rptr. 886, 753 P.2d 1082].) But that general rule does not apply " ' "when the jury would have difficulty in understanding and applying the statute. Under such circumstances, a court must give additional guidance and clarification on its own motion." ' " (*People v. Giardino* (2000) 82 Cal.App.4th 454, 465–466 [98 Cal.Rptr.2d 315].)

Sections 261, subdivision (a)(1), 288a, subdivision (g), and 289, subdivision (b) all include the element that the victim was "incapable, because of a mental disorder or developmental or physical disability, of giving *legal consent*, and this is known or reasonably should be known to the person committing the act." (Italics added; see also *People v. Mobley, supra,* 72 Cal.App.4th at p. 784.) As discussed, the term "legal consent" is understood to refer to "an intelligence capable of understanding the act, its nature, and possible consequences." (*People v. Griffin, supra,* 117 Cal. at p. 585; see *People v. Hillhouse, supra,* 109 Cal.App.4th at pp. 1620–1621; *People v. Lewis, supra,* 75 Cal.App.3d at p. 519.)

The Attorney General correctly observes as follows: "Here, even though the language of CALJIC No. 10.02 follows section 261, subdivision (a)(1), CALJIC No. 10.11 follows section 288a, subdivision (g), and CALJIC No. 10.32 follows section 289, subdivision (b), it appears that the term 'legal consent' is used in a technical sense peculiar to the law. (See *People v. Griffin, supra,* 117 Cal. at p. 585; *People v. Lewis, supra,* 75 Cal.App.3d at p. 519.) Thus, the trial court should have given an instruction as to its meaning even in the absence of a request. (*People v. Smithey* (1999) 20 Cal.4th 936, 980 [86 Cal.Rptr.2d 243, 978 P.2d 1171].)"

Jurors might well understand the meaning of "consent." But when that word is modified by the word "legal," a jury of lay people cannot be expected to understand such a term. The use of the modifier "legal" before the word "consent" suggests a meaning different from the ordinary meaning of "consent." Section 261.6 dealing with when consent is an issue defines the word "consent"—not "legal consent." "When the Legislature uses different words as part of the same statutory scheme, those words are presumed to have different meanings." (*Romano v. Mercury Ins. Co.* (2005) 128 Cal.App.4th 1333, 1343 [27 Cal.Rptr.3d 784].)

In *People v. Martinez* (2010) 47 Cal.4th 911 [105 Cal.Rptr.3d 131, 224 P.3d 877], the court dealt with a charge of forcible rape under section 261, subdivision (a)(2). The issue was whether defendant and the victim had consensual sex. (*People v. Martinez, supra,* 47 Cal.4th at p. 954.) The court

said, "We need not decide whether this evidence or counsel's arguments required the trial court to supply CALJIC No. 1.23.1's definition of consent because any error was harmless beyond a reasonable doubt. [Citation.]" (*Id.* at p. 955.) The court suggested that the common meaning of consent may not require a further definition, but concluded by saying that there was no prejudice. Thus, the court was dealing with actual consent in the context of a forcible rape—not the capacity to consent, i.e., legal consent. And the court never determined if the failure to further define consent was error or not.

The term "legal consent" requires more elucidation in this case than such terms as " 'reckless indifference to human life' " (*People v. Estrada, supra*, 11 Cal.4th at p. 572), " 'maturely and meaningfully reflected' " (*People v. Smithey, supra*, 20 Cal.4th at pp. 980–981), " 'while the defendant was engaged in' " (*People v. Poggi, supra*, 45 Cal.3d at p. 327, italics omitted), and "recurring access" (*People v. Rodriguez* (2002) 28 Cal.4th 543, 546–550 [122 Cal.Rptr.2d 348, 49 P.3d 1085]). Those terms, while perhaps not common, do not suggest a meaning that can only be understood by reference to statutes or professional works as does the term "legal consent." To use the word "legal" suggests a technical meaning. Thus, the trial court's failure to define further "legal consent" constituted error.

### B. *Prejudice*

"To determine whether the error was prejudicial we must decide what instruction the court should have given." (*People v. Bland* (2002) 28 Cal.4th 313, 335 [121 Cal.Rptr.2d 546, 48 P.3d 1107].) Here, the instruction that should have been given would have been something like CALCRIM Nos. 1004, 1019, and 1049, defining the crimes charged here and providing that a victim is "prevented from legally consenting" because of the inability "to understand the act, its nature, and possible consequences."

In instructing the jury about the charged crimes, the trial court included the element that the "alleged victim was incapable of giving legal consent, because of a mental disorder, or development or physical disability." The prosecutor argued to the jury that Jane "clearly did not have the capacity to give consent, because she can't understand the consequences of what was taking place." And defendant never argued or dealt with Jane's consent or capacity to consent. Under these circumstances, the instructional error here was not prejudicial under either the federal harmless-beyond-a-reasonable-doubt standard (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]; see generally *People v. Concha* (2010) 182 Cal.App.4th 1072, 1085–1090 [107 Cal.Rptr.3d 272] [instructional error subject to harmless

error analysis]; *People v. Lewis* (2006) 139 Cal.App.4th 874, 885–895 [44. Cal.Rptr.3d 403] [analysis of harmless error rules]) or California's "reasonably probable" standard (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]).

Accordingly, I would affirm the judgment.

A petition for a rehearing was denied November 8, 2011, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied January 11, 2012, S198006.